**BANK LEUMI TRUST COMPANY OF NEW YORK, Plaintiff,**

v.

**BANK OF MID–JERSEY, a New Jersey Corporation, Defendant.**

**Civ. A. No. 80–336.**

United States District Court, D. New Jersey.

Oct. 10, 1980.

Sterns, Herbert & Weinroth, P.A. by Mark Schorr, Trenton, N. J., Parker, Chapin, Flattau & Klimpl, New York City, for plaintiff.

Appel, Howard & Mathews by Donald N. Elsas, Browns Mills, N. J., for defendant.

## OPINION

HAROLD A. ACKERMAN, District Judge.

This is a case arising under Articles 3 & 4 of the Uniform Commercial Code, N.J.S.A. 12A:3–101 *et seq.* and 12A:4–101 *et seq.*, and, more particularly, Article 4's "midnight deadline" for the processing of checks. N.J.S.A. 12A:4–302. The focus of the case is the adventures of a certain check, number 1028, drawn on the account of Century Buick, Inc. at the defendant Bank of Mid–Jersey for the amount of $48,-470.00, and made payable to Grand Prix, a customer of the plaintiff Bank Leumi Trust Company of New York, Inc. This check was held by Mid–Jersey beyond its midnight deadline. The case is before me today on plaintiff's motion for summary judgment on the first count of its complaint, which I have decided to grant.

Since on a motion for summary judgment the party opposing the motion is entitled to have all factual inferences drawn in its favor, *Janek v. Celebrezze*, 336 F.2d 828 (3d Cir. 1964), I have analyzed this motion upon the facts as presented by Mid–Jersey in the "Statement of Facts" of its brief opposing Leumi's motion. The facts, therefore, appear as follows:

The check was drawn on October 2, 1978. Grand Prix initially deposited the check in Leumi for collection. It was routed to Mid–Jersey, which returned the check on October 4, 1978, due to insufficient funds in Century Buick's account to cover the check. On October 13, 1978, Century Buick telephoned a stop order on the check to Mid–Jersey. Sometime after October 13, 1978, Grand Prix once again deposited the check at Bank Leumi for collection from Mid–Jersey. When Leumi processed the check on the beginning of its second trip through the collection route it apparently made an error in encoding the computer readable figures that are printed at the bottom right hand corner of most checks that are presented for collection in this day and age. This encoding, along with other modern wonders, speeds the usual check through the usual channels. We are not dealing in this case with the usual check, however, due to Leumi's encoding error. Leumi encoded the check as being for $48,470.72 instead of for an even $48,470 and *no* cents. Leumi noticed this error, however, and crossed out the encoded sum with a lead pencil and, with the same pencil, wrote the corrected figure above the one that had been previously encoded. Leumi failed to encode the corrected figure, however, and its pencilled number, while quite legible to the human eye, could not be read by a computer.

So it was that check number 1028 entered the collection channels for a second time, with the rubber stamp scars of its first trip and without a properly encoded sum. It was in this humble state that the check arrived at Mid–Jersey on October 20, 1978, a Friday.

Upon arrival, Mid–Jersey determined that the check could not be processed by its high speed computer system due to the incorrect encoding and accompanying pencil marks. This check, it was determined, would have to be processed by human beings. Mid–Jersey then processed the check, posting it on the next business day, October 23, 1978, a Monday, and returning it on the following day, October 24, 1978, a Tuesday, when it determined that a stop order had been placed by its customer, which, in any event, had insufficient funds in its account to cover the check. This Tuesday return, however, was subsequent to the Bank's usual "midnight deadline," which is created by N.J.S.A. 12A:4–104 and 12A:4–302 and will be discussed in greater detail subsequently. Due to this late return, Leumi made a claim to the Federal Reserve Bank, which had presented the check to Mid–Jersey, for payment pursuant to N.J.S.A. 12A:4–302, which provides for strict liability on the part of the payor bank, in this case Mid–Jersey, to pay the amount of any check held past its midnight deadline. When the Federal Reserve Bank made its usual inquiries about the late return, Mid–Jersey submitted a "Disclaimer of Late Return" in which it denied liability. The Federal Reserve Bank took no further action against Mid–Jersey, but sent Leumi the following debit advice:

... Paying bank has denied the item was returned late .... Future action in this matter must be between you and the paying bank.

Plaintiff's Exhibit 9. The debit advice also charged the $48,470.00 back to Leumi in accordance with Federal Reserve Bank procedures.

Accepting all of these facts, Leumi argues that it is entitled to summary judgment because Mid–Jersey held the check beyond its midnight deadline. As I mentioned earlier, N.J.S.A. 12A:4–302 clearly provides that, in the absence of a limited class of valid defenses, a payor bank that holds a check beyond its midnight deadline without either paying or returning it becomes strictly liable to the presenting bank for payment of the check in full. In the present case it is uncontroverted that the

check was held beyond the midnight deadline. N.J.S.A. 12A:4–104 defines the midnight deadline as "midnight on [a bank's] next banking day following the banking day on which it receives the relevant item ...." The present check was received, according to Mid–Jersey, on Friday, October 20, 1978; Mid–Jersey's next banking day was on Monday, October 23, 1978 and before the second hand reached 12:01 A.M. on Tuesday, October 24, 1978, its midnight deadline for handling the check had passed. As Mid–Jersey admits, the check was not dishonored until sometime later in the day on Tuesday.

Leumi's argument is a sound one, and they seem to be entitled to payment from Mid–Jersey in accordance with the provisions of N.J.S.A. 12A:4–302. Mid–Jersey, however, has made four arguments in an attempt to avoid the operation of section 4–302. I will discuss these arguments in the order presented in the brief opposing the present motion.

■ First, Mid–Jersey argues that it is excused from meeting its midnight deadline because the delay was caused by circumstances beyond its control, namely the pencil marks and encoding error on the check. In support of this argument Mid–Jersey relies on N.J.S.A. 12A:4–108(2). That section of Article 4 provides that delay past the midnight deadline

> is excused if caused by interruption of communication facilities, suspension of payments by another bank, or, emergency conditions or other circumstances beyond the control of the bank provided it exercises such diligence as the circumstances require.

Mid–Jersey argues that the circumstance that check number 1028 had to be manually processed, instead of being handled by a computer, is so anomalous in "the civilized world today" that it should qualify as "other circumstances beyond the control of the bank." Defendant's Brief at 4. To state this argument is to reject it. Both the Uniform Commercial Code Comment and the New Jersey Study Comment make it clear that this section is designed to permit

delay only in extreme situations. In the words of the U.C.C. Comment:

> Examples of these situations include blizzards, floods, or hurricanes, and other "Act of God" events or conditions, and wrecks or disasters, interfering with mails; suspension of payments by another bank; abnormal operating conditions such as substantial increased volume or substantial shortage of personnel during war or emergency situations.

U.C.C. Comment to 4–108, ¶ 4, set out following N.J.S.A. 12A:4–108. The eventuality of a check being impossible to run through a computer is simply not in this class of events. Moreover, nothing in the Code requires a check to be computer encoded or computer readable. To the contrary, the definition of a check contained in 12A:3–104 does not even require it to be written upon the customary bank form, or even upon paper. Even in what Mid–Jersey calls "the civilized world" a bank must be prepared to handle a check properly even when it is not fit to be run through a computer. The provisions of Article 4 of the Code nowhere make a distinction in time limits between checks that can be computer processed and those that cannot. Certainly nothing in section 4–108(2) can support the construction urged upon this Court by Mid–Jersey.

■ Mid–Jersey's second argument is based upon N.J.S.A. 12A:3–511(4). That section provides that

> Where a draft has been dishonored by non–acceptance a later presentment for payment and any notice of dishonor and protest for non–payment are excused unless in the meantime the instrument has been accepted.

Mid–Jersey argues that since check 1028 had been previously dishonored, this section permitted it to pass its midnight deadline when it dishonored the check for a second time. I will accept Mid–Jersey's argument that a check is a draft within the meaning of the Code, since the definition of a check contained in N.J.S.A. 12A:3–104 defines a check as "a draft drawn on a bank payable on demand." I also recognize that check

1028 was a previously dishonored draft. Nevertheless, Mid–Jersey's argument must be rejected because the check had been "in the meantime . . . accepted" by Mid–Jersey when it passed its midnight deadline.

The definition of "acceptance" contained in N.J.S.A. 12A:3–410(1) envisions action on the part of the drawee, in this case Mid–Jersey. Although section 3–410 speaks specifically of a signature on a draft, I believe that in the case of a check its provisions must be read in harmony with Article 4, which provides detailed regulation of the handling of checks. There can be no doubt that Article 4 was intended to facilitate the tremendous number of checks that pass through commerce every day and to create a strict set of rules so that presenting and depository banks would know precisely when a check had been accepted or dishonored. In the words of Arthur Lawrence Abrams, the chair of the New Jersey Commission to Study and Report on the U.C.C.,

> The check collection process is a mechanical operation and the rules should be similarly mechanical. Precision in detail is more important than general principles.

Introductory Commentary to Article 4, set out preceding N.J.S.A. 12A:4–101; *see also* U.C.C. Comment to 4–101, set out following N.J.S.A. 12A:4–101. In other words, certainty in the overall operation of commerce was determined to be a more important value than the fate of any particular check. Article 4 makes it clear that a check is accepted by a payor bank when it is held past its midnight deadline. N.J.S.A. 12A:4–302. This type of acceptance occurred in the present case subsequent to the previous dishonor and Mid–Jersey does not, therefore, have the section 3–511(4) defense available to it. In this regard, I am in full accord with the thoughts expressed by the Kentucky court in *Blake v. Woodford Bank & Trust Co.*, 555 S.W.2d 589, 21 U.C.C. Rep. 383, 396–400 (Ky.Ct. of App.1977):

> If a payor bank is not bound by its midnight deadline as to previously dishonored items, then there is no way for the depository bank to know whether a previously dishonored item has been paid upon representment except by direct communica-

tion with the payor bank. Such a procedure would impose an unnecessary burden upon the check collection process.

The plain fact is that in the modern world of check collection a clear cut, mechanical rule of check acceptance is necessary, and the common eventuality of previously dishonored checks being represented cannot be permitted to upset a system relied upon by banks all across the nation. Accordingly, Mid–Jersey's second argument must be rejected.

■ Mid–Jersey bases its third argument upon the Federal Reserve Bank's acceptance of its "Disclaimer of Late Return" and failure to charge Mid–Jersey's account with the $48,470.00.

As I understand the usual check collection process, the Federal Reserve Banks serve as regional clearing–houses for checks. When a member bank presents a check for collection it receives a provisional credit for the amount of the check and the payor bank is charged with a compensating provisional debit. Normally this provisional accounting becomes final when the midnight deadline passes, unless the payor bank reports a dishonor or returns the check, in which case the provisional accounting is reversed, leaving the accounts as they were before the check was presented.

In the present case, when the Federal Reserve Bank received Mid–Jersey's disclaimer, it debited Leumi's account and credited Mid–Jersey's, thereby undoing whatever "final" accounting may have occurred when the midnight deadline passed. Mid–Jersey now argues that this action by the Federal Reserve Bank constitutes a variance of the normal Article 4 provisions by the Federal Reserve Bank and therefore displaces the Code provisions in accordance with N.J.S.A. 12A:4–103(2). That section provides that all banks are subject to any "Federal Reserve regulations and operating letters, clearing–house rules, and the like" that may vary the U.C.C. provisions and that the Federal Reserve regulations, etc. have the effect of preempting any Code provisions that may be contrary to them.

The simple answer to this argument is that the Federal Reserve's action in the

present case does not amount to a regulation, operating letter, clearing–house rule or the like. All of the actions envisioned by the Code section are actions having a far–reaching effect, i. e., those decisions that affect the way many banks handle their checks. In that regard section 4–103 is congruent with the general purpose of U.C.C. Article 4, that is, uniformity of operations among banks nationally. Section 4–103 insures that banks won't be placed in the double–bind of conflicting regulations from the states and the Federal Reserve by declaring that Federal Reserve rules prevail. All that the Federal Reserve did in the present case was balance its books. Indeed its own debit notice to Leumi stated that "Future action in this matter must be between you and the paying bank." Plaintiff's Exhibit 9. This case is Leumi's future action against the paying bank. No actions taken by the Federal Reserve have the effect of barring that action.

■ Mid–Jersey's final argument is that equitable concerns should bar this Court from granting summary judgment to Leumi. This argument is based on N.J.S.A. 12A:1–103 which provides that

> Unless displaced by the particular provisions of the Act [i. e., the U.C.C.,] the principles of law and equity, shall supplement its provisions.

The simple answer to this argument is that N.J.S.A. 12A:4–302 is a particular provision of the U.C.C. that displaces Mid–Jersey's equitable argument. But even if that were not a sufficient answer, the equities of this case do not favor Mid–Jersey. Leumi's only supposedly inequitable conduct was placing the pencil marks on the check and failing to properly encode the check. These actions neither violated any Code provisions nor created a document that could not be reasonably handled manually. A bank must be prepared to handle checks that are not in perfect computer form and it is not inequitable to expect Mid–Jersey to handle the check in the present case properly.

It is true that granting summary judgment means that Mid–Jersey must pay Leumi $48,470.00. But Mid–Jersey is not without remedies: it may proceed against its customer Century Buick, something it has already attempted to do through a third party complaint in the present action. It is true that $48,470.00 may seem a high price to pay for a day's delay, but it must be remembered that this case only determines which of three innocent parties, the payee Grand Prix, the depository Bank Leumi, or the payor bank Mid–Jersey, must absorb the loss of Century Buick's wrongful conduct in writing a check on insufficient funds. Article 4 of the U.C.C. provides clear cut rules for deciding who among the innocent parties must absorb the loss created by Century Buick's wrongdoing. If Mid–Jersey had met its midnight deadline it would have passed that loss back to either Leumi or Grand Prix. It failed to do so, therefore the U.C.C. declares that Mid–Jersey must absorb the loss. It is not inequitable to enforce the provisions of the U.C.C. Indeed, it would be inequitable not to do so, because the smooth flow of commerce relies upon the application of the U.C.C., and that flow should not be interrupted by countenancing minor equitable defenses like pencil marks on a check.

Leumi's motion for summary judgment on the first count of its complaint will, therefore, be granted.