In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3309

Oak Brook Bank,

Plaintiff-Appellant,

v.

Northern Trust Company,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 1849--James B. Zagel, Judge.

Argued February 26, 2001--Decided July 6, 2001

Before Bauer, Posner, and Kanne, Circuit
Judges.

Posner, Circuit Judge.  A bank that
dishonors a check presented to it for
payment must return the check to the bank
in which the check had been deposited
(the "depositary" bank), either directly
or via a "returning bank," which acts as
a transmitting agent. (The bank to which
the check is  presented for payment is
called, even if it dishonors the check,
the "payor" bank--a confusing usage in
this context since it has refused to pay
the check.) Like the other federal
reserve banks, the Federal Reserve Bank
of Chicago is a returning bank; indeed,
returning checks is the major
conventional banking activity in which
federal reserve banks engage. In the case
at hand, a check kiter who had accounts
in both Oak Brook Bank and Northern Trust
Company deposited in his Oak Brook
account checks (none for less than
$2,500) totaling some $450,000 drawn on
his Northern account, which had only a
minute balance (exactly how much, the
record does not disclose). The checks
were presented to Northern for payment
the next day, February 11, 1998. On
February 13, Northern decided to dishonor
them and it informed Oak Brook of that
decision by phone shortly before 4 p.m.
By that time, however, Oak Brook had
credited the kiter's account and he had

withdrawn all but about $7,000 of the money in the account. At 4:30 p.m., Northern sent the dishonored checks by courier to the Federal Reserve Bank, which received them sixteen minutes later.

Oak Brook sued the kiter and the kiter's company in federal district court under RICO and added a claim under the supplemental jurisdiction of the district court (28 U.S.C. sec. 1367(a)) against Northern, charging that the dishonor was ineffective because the return of the checks was untimely and concluding that therefore Northern must make good Oak Brook's loss. The district court granted summary judgment for Northern and entered a Rule 54(b) judgment enabling Oak Brook to take an immediate appeal. The claim against the kiter and his company remain pending in the district court. The issue in this appeal, a novel one, is the meaning of "banking day" in regard to federal reserve banks.

The banking article of the Uniform Commercial Code requires the payor bank that wishes to dishonor a check to dispatch it (for example by putting it in the mail), either to the depositary bank or to a "returning" bank for forwarding to the depositary bank, by midnight on the next banking day after the banking day on which the payor bank had received the check; and failure to make the deadline requires the payor bank to pay the check. UCC sec.sec. 4-104 (a)(10), 4-302(a)(1), 810 ILCS 5/4-104(a)(10), 302(a)(1). Northern missed this deadline, for remember that it received the checks on February 11 but didn't dispatch them to the Federal Reserve Bank until the thirteenth. No matter. In 1987, concerned about delay in depositors' access to funds that they deposited by check, Congress, in the Expedited Funds Availability Act, 12 U.S.C. sec.sec. 4001-10, shortened the "hold period" of depositary banks, that is, the period after a check is deposited before the depositor can withdraw the money from his account. 12 U.S.C. sec. 4002. The shortening of the hold period increased the risk of nonpayment to these banks, and to deal with that problem the Act authorized the Federal Reserve Board to issue regulations governing the system of bank payments. 12 U.S.C. sec. 4008(c)(1). Pursuant to this grant of authority the

Board issued Regulation CC, 12 C.F.R. pt. 229, which contains two provisions that bear on this case. The first requires prompt notice of dishonor in the case of any check for more than $2,500, such as the kiter's checks that Northern dishonored. 12 C.F.R. sec. 229.33(a). It is conceded that this provision was satisfied by Northern's phone call to Oak Brook on the thirteenth. But second--and this is critical--the regulation extends the UCC's deadline from midnight to when the payor bank dispatches the dishonored check on its return journey, provided the bank "uses a means of delivery that would ordinarily result in receipt by the bank to which it is sent . . . on or before the receiving bank's next banking day following the otherwise applicable deadline." 12 C.F.R. sec. 229.30(c)(1).

It may seem odd that delay in returning the checks should make the payor bank have to pay them in a case such as this, when it had notified the depositary bank that the checks had been drawn against insufficient funds in time for that bank to prevent any money from being withdrawn. Oak Brook seems to have been careless in allowing the kiter to withdraw "his" money so fast. Of course it didn't know he was a kiter. But because of the size of the deposit, it could have refused withdrawal for seven business days, see 12 C.F.R. sec.sec. 229.13(b), (h)(1), (h)(4), and thus until February 20; and had it done so it wouldn't have been left holding the bag, since it received notice of the dishonor on the thirteenth and the checks themselves back on the seventeenth. But all that is irrelevant. If Northern missed the extended deadline in Regulation CC, it must pay the checks. The reason for this severe sanction is that the depositary bank could get into serious trouble if it refused to allow a depositor to withdraw his money, or took other action against a depositor, without proof that the depositor had no right to the money. See UCC sec. 4-402, 810 ILCS-5/4-402.

And now we come at last to the nub of the case. The provision that we quoted from Regulation CC extending the deadline requires that the method of delivery used be calculated to get the check to the depositary or, as here, the returning bank by that bank's "next banking day

following the otherwise applicable deadline." The "otherwise applicable deadline" was the UCC's deadline of midnight on February 12, the day after Northern received the checks. The "next banking day" was the thirteenth, and so Northern had to get the checks to the Federal Reserve Bank, the returning bank, by the end of the Federal Reserve Bank's "banking day" on the thirteenth; and the question is whether it made this deadline.

Regulation CC defines "banking day" as "that part of any business day on which an office of a bank is open to the public for carrying on substantially all of its banking functions." 12 C.F.R. sec. 229.2(f) (emphasis added). (The UCC's definition of "banking day" is materially identical. See UCC sec. 4-104(a)(3).) Oak Brook argues that by 4:46 p.m. on February 13, the Federal Reserve Bank of Chicago was no longer carrying on "substantially all of its banking functions." More precisely, it argues that whether it was or not is a contestable issue and so the grant of summary judgment for Northern was premature.

The Federal Reserve Bank of Chicago is open 24 hours a day, but that is neither here nor there. Federal reserve banks perform many functions for the banking system that are not banking functions. The question is whether at 4:46 p.m. on February 13, 1998, it was still carrying on substantially all of its banking functions. The bank's main banking function is check processing (including returns) for other banks--and it turns out that we need not consider what if any other banking functions the Federal Reserve Bank of Chicago, or any other federal reserve bank, performs. For that matter, it is of no significance that check processing is the Chicago reserve bank's main banking activity. Regulation CC states that a federal reserve bank is a bank within the meaning of the regulation only insofar as it is a "paying bank," the definition of which, so far as pertains to federal reserve banks, appears to be limited to a bank that processes checks. See 12 C.F.R. sec.sec. 229.2(e), (z). Given that definition and the fact that Regulation CC is concerned solely with check processing, we think that for purposes of

the regulation "all of [a federal reserve bank's] banking functions" means check processing. For it is irrelevant to the purpose of the regulation whether the bank is performing some other banking function on a particular day or at a particular time of day; and it would impair the utility of the extended deadline if a payor bank (Northern here), in order to determine what the deadline was, had to familiarize itself with the daily schedule of a bank's banking operations unrelated to check processing. This point is not logically limited to federal reserve banks, but we need not decide its applicability to banks that provide a broader range of conventional banking services and, unlike federal reserve banks, are not defined in the regulation as limited-purpose banks.

So the issue narrows to whether the Federal Reserve Bank of Chicago was open to the public (Oak Brook concedes that this means to other banks, which are a federal reserve bank's only "public") at 4:46 p.m. on February 13 for processing checks. The bank's check-processing department employs about 100 persons, with half or even more working during the peak hours of midnight to 9 a.m. Between 4 and 5 on a Friday afternoon, however (February 13, 1998, was a Friday), only one or two persons are on duty in thedepartment. The processing of returned checks includes receipting the checks, sorting them by type and region, dispatching them to the depositary bank, and confirming the amount returned. When only one or two employees are on duty in the department, only receipting is completed; sorting is begun but not completed; dispatching, crediting, and, of course, confirming are not even begun. If, therefore, as Oak Brook argues, all these are separate functions, it cannot be said that the Federal Reserve Bank of Chicago performs substantially all of its banking functions on Friday afternoons after 4, and therefore Northern missed the deadline and must pay the checks.

We reject the argument, primarily on practical grounds. It would be impractical for payor banks to monitor the internal operations of returning banks in order to make sure that sending a check by courier at a given hour on a given day would be an occurrence that was within the returning bank's "banking

day." It is telling in this regard that Oak Brook's lawyer was unable to pinpoint the end of the Federal Reserve Bank's banking day on February 13, 1998. The end was earlier than 4:46 p.m., he told us, but he was unable to say how much earlier, though he thought it might have been at 2 p.m. To fix the precise time would require, he told us, an in-depth inquiry, and therefore a trial.

Faced with such uncertainty, payor banks would tend to go back to the old UCC deadline, which Regulation CC does not supersede but merely supplements. Had Northern placed Oak Brook's checks in the mail to the Federal Reserve Bank of Chicago shortly before midnight on February 12 (the old UCC deadline), the checks probably wouldn't have gotten to that bank until the seventeenth (Monday the sixteenth was a federal holiday), and processing would have begun then rather than been completed then and therefore Oak Brook might not have received the checks as soon as it did. The added delay would have made no difference in this case but could make a difference in other cases.

We hold, therefore, that a federal reserve bank is open to the public for substantially all of its banking functions whenever the check-processing department is open for the receipt of checks, which in the case of the Federal Reserve Bank of Chicago is 24 hours of every day that the bank is open. The few cases dealing with the meaning of "banking day" under the materially identical definition of the term in the UCC are in accord with our position, United Bank of Crete-Steger v. Gainer Bank, N.A., 874 F.2d 475 (7th Cir. 1989); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Devon Bank, 832 F.2d 1005, 1007 (7th Cir. 1987), the latter emphasizing as do we today the practical objections to the fact-intensive, case-by-case approach urged by Oak Brook. (Neither case involved a federal reserve bank.) Northern's employment of a means of delivery calculated to get the checks to the Federal Reserve Bank by any time up to midnight on February 13 therefore beat the deadline, and so summary judgment in Northern's favor was rightly granted. We leave open the implications of our analysis for returning banks other than federal reserve banks, who we were told

dominate the check-return function.

Affirmed.