**NBT BANK, National Association**
**Plaintiff**

v.

**FIRST NATIONAL COMMUNITY**
**BANK Defendant**

No. 3:CV–01–0936.

United States District Court,
M.D. Pennsylvania.

Oct. 17, 2003.

Charles J. Ferry, Robert J. Tribeck, Thomas A. French, Rhoads & Sinon LLP, Harrisburg, PA, for Plaintiff.

David R. Overstreet, Raymond P. Pepe, Kirkpatrick & Lockhart, LLP, Lucinda C. Glinn, Harriburg, PA, for Defendant.

## MEMORANDUM

VANASKIE, Chief Judge.

At issue in the present case on cross-motions for summary judgment is whether an encoding error by Defendant First National Community Bank (FNCB) converted an otherwise timely return of a check under the Uniform Commercial Code's "midnight deadline rule" into an untimely return, thereby making FNCB accountable to Plaintiff NBT Bank (NBT) for the face amount of the returned $706,000 check pursuant to 13 Pa. Cons.Stat. Ann. § 4302, even though NBT concedes that it suffered no injury as a result of the encoding error. Also at issue is whether NBT has standing to sue in light of its concession that it did not sustain injury as a result of FNCB's actions.

Although NBT does have standing to sue to enforce what is, in essence, a statutory provision allocating the risk of loss for a check not covered by sufficient funds in the payor bank's account, the encoding error alone did not effect a failure to meet the midnight deadline for the return of the check by FNCB. Accordingly, the automatic liability provision of 13 Pa. Cons. Stat. Ann. § 4302 is inapplicable, and FNCB is entitled to judgment in its favor.

## I.  Factual Background

The relevant facts in the present case, having been presented by stipulation of the parties, are not in dispute.  NBT and FNCB are both national banking associations.  Human Services Consultants, Inc. (HSC) maintained a demand deposit (commercial checking) account at FNCB. A related corporation, Human Services Consultants Management, Inc. (HSCM), maintained a demand deposit (commercial checking) account at NBT; and HSCM, d/b/a PA Health (PA Health), maintained a second demand deposit (commercial checking) account at NBT.

Around March 8, 2001, PA Health presented a check in the amount of $706,000 (the disputed check) for deposit in the second NBT account.  The disputed check was drawn on the account maintained by HSC at FNCB. NBT credited $706,000 to the second NBT account as a provisional settlement to PA Health.  By cash letter dated March 8, 2001, NBT transmitted the disputed check to the Federal Reserve Bank of Philadelphia (Reserve Bank) for presentment to FNCB.

The parties' Joint Statement of Stipulated Facts recites the remaining relevant facts as follows:

11.  The Disputed Check was received by FNCB from Reserve Bank on March 12, 2001.

12.  On the morning of March 13, 2001, FNCB determined it would not honor the Disputed Check due to insufficient funds.

13.  Prior to the close of business on March 13, 2001, FNCB sent notice of the dishonor of the Disputed Check to NBT via the FedLine.  NBT received this notice prior to the close of business on March 13, 2001.  The FedLine is an electronic notification service operated by Reserve Bank that banks may use to comply with notice obligations.

*       *       *       *       *       *

15.  Prior to sending the Disputed Check to Reserve Bank on March 13, 2001, FNCB attached a strip to the Disputed Check encoded with the routing number for PNC Bank, a bank unrelated to the transaction, rather than the routing number for NBT.

16.  The Disputed Check was received by Reserve Bank on or before 11:59 p.m. on March 13, 2001.

17.  Had FNCB encoded the Disputed Check with the routing number for NBT, the parties expect that NBT would have received the Disputed Check on the morning of March 14, 2001.

18.  On March 14, 2001, representatives of FNCB phoned representatives of NBT and informed them of FNCB's dishonor of the Disputed Check.  Also on March 14, 2001, NBT received a letter by fax from FNCB in which FNCB advised NBT of its dishonor of the Disputed Check.

19.  NBT received the Disputed Check on March 16, 2001.

20.  Upon receipt of the Disputed Check on March 16, 2001, NBT presented the Disputed Check to Reserve Bank as a 'Late Return,' wherein NBT advised the Reserve Bank that it believed that the Disputed Check was untimely returned by FNCB.

21.  On or about March 26, 2001, FNCB submitted a 'Paying Bank's Response to Claim of Late Return' to Reserve Bank, wherein FNCB certified that the Disputed Check was returned to Reserve Bank prior to midnight on March 13, 2001.

22.  On March 29, 2001, Reserve Bank reversed the $706,000.00 provisional credit for the Disputed Check that was originally provided to NBT.

23.  NBT did not suffer actual damages as a result of the conduct of FNCB

described in this stipulation or alleged in the Complaint in this proceeding.

The disputed check was part of a check kiting scheme involving HSC, HSCM, and PA Health.[1] As a result of the check kiting scheme, NBT suffered a monetary loss in excess of $1,000,000, including the $706,000 at issue in the present case.

## II. Procedural History

NBT filed this action on May 25, 2001. On January 16, 2002, the parties filed a Notice of Voluntary Dismissal Pursuant to Fed.R.Civ.P. 41, stipulating to the dismissal of all counts in the complaint, with prejudice, except for Count I. Count I, which is the subject matter of the present motions for summary judgment, asserts that FNCB's error in encoding the disputed check resulted in a failure to return the disputed check within the time period required by the pertinent provisions of Article 4 of the Uniform Commercial Code (U.C.C.) as adopted in Pennsylvania, 13 Pa. Cons.Stat. Ann. §§ 4101, *et seq.*

## III. Discussion

### A. Standard for Summary Judgment

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under

the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. As noted above, the facts necessary to resolve the issue in the present case are undisputed, and the issues presented are essentially questions of law.

### B. Standing

FNCB presents a threshold challenge to the justiciability of this case, claiming that NBT lacks standing to sue for violation of the midnight deadline rule because NBT suffered no actual damages as a result of any such violation. To understand this argument, it is first necessary to explain the midnight deadline rule and the strict accountability provision of § 4302 of the Uniform Commercial Code, codified in Pennsylvania at 13 Pa. Cons. Stat. Ann. § 4302.

The Uniform Commercial Code defines a bank's "midnight deadline" as "midnight on its next banking day following the banking day on which it receives the relevant item." 13 Pa. Cons.Stat. Ann. § 4104(a). Pursuant to 13 Pa. Cons.Stat. Ann. § 4301(a)(1), a payor bank,[2] such as FNCB in the present case, may avoid liability on a demand item, such as a check, if it returns the item "before its midnight deadline." A payor bank is "accountable" for the amount of a check, "whether prop-

---

1. For a general explanation of check kiting, see *First Nat'l Bank in Harvey v. Colonial Bank,* 898 F.Supp. 1220, 1222–23 (N.D.Ill. 1995). "Check kiting is a form of bank fraud. The kiter opens accounts at two (or more) banks, writes checks on insufficient funds on one account, then covers the overdraft by depositing a check drawn on insufficient funds from the other account." *Id.* at 1222 (footnote omitted).

2. A payor bank is "[a] bank that is the drawee of a draft." 13 Pa. Cons.Stat. Ann. § 4105. In this case, FNCB is the payor bank. A depositary bank, which is NBT in the present case, is "[t]he first bank to take an item even though it is also the payor bank unless the item is presented for immediate payment over the counter." 13 Pa. Cons.Stat. Ann. § 4105.

erly payable or not, if the bank, in any case in which it is not also the depositary bank, retains the item beyond midnight of the banking day of receipt without settling for it or, whether or not it is also the depositary bank, does not pay or return the item or send notice of dishonor until after its midnight deadline ...." 13 Pa. Cons.Stat. Ann. § 4302(a)(1) (2001). As explained in *Chrysler Credit Corp. v. First Nat'l Bank & Trust Co. of Washington,* 746 F.2d 200, 203 (3d Cir.1984):

> These limitations require that payor banks make decisions on demand items to insure prompt payment to a chain of individuals and institutions in a fluid commercial transaction. Otherwise, a situation is created where a series of banks are extending credit to each other.

These statutory provisions are thus intended to promote the efficient processing of demand deposit items by allocating to the payor bank strict accountability for the face value of a check not returned by its midnight deadline.[3]

Pointing out that NBT has conceded that its loss on the disputed check is not "fairly traceable" to the alleged breach of the midnight deadline rule, FNCB insists that NBT lacks standing to maintain this action. Acknowledging that courts have consistently allowed recovery for breach of the midnight deadline rule even if the breach could not be said to have caused the plaintiff's loss, *e.g., First Nat'l Bank in Harvey v. Colonial Bank,* 898 F.Supp. 1220, 1227 (N.D.Ill.1995), FNCB asserts that the courts have not considered the standing question presented here.

"In its requirement that a litigant 'must allege personal injury fairly traceable to the ... allegedly unlawful conduct and likely to be redressed by the requested relief,' the core of standing doctrine is generally regarded as part of the case-or-controversy limitation of Article III, which defines 'with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded.'" Laurence H. Tribe, *American Constitutional Law* § 3–15 (3d ed.2000) (citations omitted). In this case, there can be no doubt that NBT has suffered an "injury in fact," i.e., it lost $706,000 on the disputed check. It also cannot be doubted that the loss would be redressed by the requested relief. The fact that the loss cannot be traced to the breach of the midnight deadline rule does not destroy standing here because the legislative judgment on allocation of the risk of loss supplies the requisite nexus between the injury and the requested relief.

"[S]tanding is gauged by the specific common-law, statutory or constitutional claims that a party presents." *Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund,* 500 U.S. 72, 77, 111 S.Ct. 1700, 114 L.Ed.2d 134 (1991). That is, " 'the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication *of the particular claims asserted.*' " *Id.* (alteration in original)(quoting *Allen v. Wright,* 468 U.S. 737, 752, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). In the context of statutorily created causes of action, "[i]nsofar as the statute defines the duty, it characterizes the injury and, if not explicitly, implicitly describes those who are entitled to enforce it." *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1513 n. 10 (9th Cir.1992).

In this case, the Uniform Commercial Code defines the duty, the consequences of

---

**3.** Defenses against such strict liability, however, may be available for such matters as breach of presentment warranty or fraud on the payor bank. 13 Pa. Cons.Stat. Ann. § 4302(b).

a breach of that duty, and the party entitled to recoup its losses in the event of a breach of the duty. The legislature has allocated the loss to the payor bank missing its midnight deadline. The legislature also has determined that the depositary bank can hold the payor bank accountable without having to show that the breach caused the depositary bank's loss. This legislative judgment concerning the proper incentives to promote efficient processing of checks is controlling here on the question of standing.

"Standing to sue is limited to those entities which did suffer or might have suffered a loss that falls within the risk of loss created by the bank's failure to take prompt action." 9 C.J.S. *Banks and Banking* § 374 (2003) (footnote omitted). In the present case, NBT's risk of loss—the face amount of the disputed check—was within the scope of that created by FNCB's alleged failure to return the check prior to the midnight deadline. In accordance with prior case law, therefore, NBT has standing to bring a claim for violation of the midnight deadline rule.

As NBT explains, the alleged breach of the midnight deadline rule imposed on FNCB a duty to "account" to NBT for the face value of the check. NBT's action is based, then, upon the breach of the statutory duty to account. NBT's injury in fact can thus be said to be "fairly traceable" to FNCB's failure to account as required by statute. Accordingly, NBT has standing to maintain this action.

### C. The Encoding Error and the Midnight Deadline Rule

■ As applied to the present case, the midnight deadline was 12:00 a.m. on the morning of March 14, 2001. Regarding the midnight deadline, the Pennsylvania U.C.C. further provides:

(a) **Return by payor bank of item provisionally settled.**—If a payor bank settles for a demand item other than a documentary draft presented otherwise than for immediate payment over the counter before midnight of the banking day of receipt, the payor bank may revoke the settlement and recover the settlement if, before it has made final payment and before its midnight deadline, it:

(1) returns the item; or

(2) sends written notice of dishonor or nonpayment if the item is unavailable for return.

\*   \*   \*   \*   \*   \*

(d) **Acts constituting return of item.**—An item is returned:

(1) as to an item presented through a clearinghouse, when it is delivered to the presenting or last collecting bank or to the clearinghouse or is sent or delivered in accordance with clearinghouse rules; or

(2) in all other cases, when it is sent or delivered to the bank's customer or transferor or pursuant to his instructions.

13 Pa. Cons.Stat. Ann. § 4301 (2001). FNCB physically returned the disputed check to the Reserve Bank before the midnight deadline, but it erroneously encoded the routing number on the magnetic strip attached to the check.

NBT argues that proper encoding is essentially imported into the Uniform Commercial Code's definition of what constitutes an effective "return" of a check. In support of this argument, NBT asserts that the Federal Reserve Bank is a "clearinghouse" as that term is used in 13 Pa. Cons.Stat. Ann. § 4301(d)(1), which provides that an item is returned when it is sent or delivered to a clearinghouse "in accordance with the clearinghouse rules." Contending that correct encoding of the depositary bank's identification is an appli-

cable "clearinghouse rule" of the Federal Reserve Bank, NBT concludes that the otherwise timely physical delivery of the check to the Federal Reserve Bank was rendered ineffective by FNCB's encoding error.

FNCB counters by asserting that the Federal Reserve Bank is not a "clearinghouse" under the applicable provisions of the U.C.C., thus making § 4301(d)(1) inapplicable. It then argues that under the U.C.C., Federal Reserve regulations do not constitute "clearinghouse rules," but instead form part of the contractual relationship among the parties with respect to the collection and return of checks. Pointing out that the regulations at issue in this case limit liability to actual injury caused by an encoding error and that NBT has stipulated that it did not sustain any injury as a result of the encoding error, FNCB concludes that the strict liability provision of § 4302 is inapplicable here.

It is clear that, for purposes of the Uniform Commercial Code, the Reserve Bank is a bank, not a clearinghouse. Federal Reserve Board Regulation CC, 12 C.F.R. pt. 229, upon which NBT relies, explicitly states that "the term bank ... includes any person engaged in the business of banking, *as well as a Federal Reserve Bank* ...." 12 C.F.R. § 229.2(e)(7) (emphasis added). "[T]he Fed is a bank only for purposes of accepting checks for collection or return, and its sole 'banking function' is check handling. ... [T]he Fed is a banker only to other banks who require check processing services ...." *Oak Brook Bank v. Northern Trust Co.,* No. 98 C 1849, 2000 WL 294081, at *2 (N.D.Ill. March 20, 2000), *aff'd,* 256 F.3d 638 (7th Cir.2001). The Reserve Bank in this case accepted the disputed check as part of its check processing services.

A "clearinghouse," on the other hand, is defined as "[a]n *association* of banks or other payors regularly clearing items." 13

Pa. Cons.Stat. Ann. § 4104 (emphasis added). Federal Reserve Banks have been members of clearinghouses. *See, e.g., Hallenbeck v. Leimert,* 295 U.S. 116, 120, 55 S.Ct. 687, 79 L.Ed. 1339 (1935) ("The Federal Reserve Bank ... [was a] regular member[ ] of the Chicago Clearing House Association ...."). Although Federal Reserve Banks might perform the functions of a clearinghouse, *see, e.g.,* 12 U.S.C. § 248–1; *Wash. Petroleum and Supply Co. v. Girard Bank,* 629 F.Supp. 1224, 1227 (M.D.Pa.1983), they are not "clearinghouses" by definition.

Further evidence that Federal Reserve Banks are not considered to be "clearinghouses" is the distinction made between Federal Reserve regulations and clearinghouse rules in 13 Pa. Cons.Stat. Ann. § 4103(c) ("Action or inaction approved by this division or pursuant to Federal Reserve regulations or operating circulars is the exercise of ordinary care and, in the absence of special instructions, action or nonaction consistent with clearinghouse rules and the like or with a general banking usage not disapproved by this division, is prima facie the exercise of ordinary care."). Therefore, at least for the purposes of this case, the Reserve Bank is not a clearinghouse and 13 Pa. Cons.Stat. Ann. § 4301(d)(1) is inapplicable.

■ Since the Reserve Bank is not a clearinghouse, the applicable provision for "acts constituting return of item" is 13 Pa. Cons.Stat. Ann. § 4301(d)(2), providing that an item is returned "when it is sent or delivered to the bank's customer or transferor or pursuant to his instructions." Usage of the words "sent" and "delivered" tends to focus on the physical return of the check and does not suggest encoding requirements for a strip attached to a check. The Pennsylvania U.C.C. provides the following definition for "send":

In connection with any writing or notice, means to deposit in the mail or deliver for transmission by any other usual means of communication with postage or cost of transmission provided for and properly addressed and in the case of an instrument to an address specified thereon or otherwise agreed, or if there be none to any address reasonable under the circumstances. The receipt of any writing or notice within the time at which it would have arrived if properly sent has the effect of a proper sending. 13 Pa. Cons.Stat. Ann. § 1201 (2003). "Delivery" is defined as follows: "With respect to instruments, documents of title, chattel paper or certificated securities, [it] means voluntary transfer of possession." 13 Pa. Cons.Stat. Ann. § 1201 (2003). The Official Comment to the U.C.C. further states that § 4301(d) "leaves banks free to agree upon the manner of returning items but establishes a precise time when an item is 'returned.'" U.C.C. § 4–301 cmt. 6 (2002). There is no dispute in this case that the disputed check was sent and delivered within FNCB's midnight deadline.

NBT argues that even if 13 Pa. Cons. Stat. Ann. § 4301(d)(2) is the applicable provision, the Reserve Bank's encoding requirements are incorporated as "instructions." However, NBT's position would ignore the liability provisions set forth by the Reserve Bank and the U.C.C. itself, as discussed below. NBT fails to cite authority for selective incorporation of the encoding requirement, but not the limitation on liability for an encoding error. NBT's position would lead to unnecessary conflict between the strict liability of 13 Pa. Cons. Stat. Ann. § 4302 and the other liability provisions set forth by the Reserve Bank and the U.C.C. Furthermore, compliance with "instructions" pursuant to 13 Pa. Cons.Stat. Ann. § 4301(d)(2) is only one of two possible means of satisfying the return requirement. An item also can be returned by sending or delivering it to the bank's transferor, which is what occurred in this case.

In *Bank Leumi Trust Co. of N.Y. v. Bank of Mid–Jersey,* 499 F.Supp. 1022, 1025 (D.N.J.1980), it was the depositary bank, the plaintiff Bank Leumi, that made an encoding error. Defendant Bank of Mid–Jersey, the payor bank, held on to the check beyond its midnight deadline and sought to use the plaintiff's encoding error to excuse its violation of U.C.C. § 4–302, adopted in New Jersey. The court, however, noted that "nothing in the [Uniform Commercial] Code requires a check to be computer encoded or computer readable.... The provisions of Article 4 of the Code nowhere make a distinction in time limits between checks that can be computer processed and those that cannot." It also ruled that the failure to properly encode a check "neither violated any Code provisions nor created a document that could not be reasonably handled manually." *Bank Leumi Trust Co. of N.Y.,* 499 F.Supp. at 1027. The court found strict liability under § 4–302, and held that Mid–Jersey was liable for the amount of the check. As encoding errors did not affect liability under § 4–302 in *Bank Leumi Trust Co. of N.Y.,* so too FNCB's encoding error does not affect its liability under § 4–302.

In sum, the midnight deadline rule focuses on timing and a physical transfer; the requirements for "delivering" or "sending" an item are separate from encoding requirements. Accordingly, the return of a check under the midnight deadline rule does not encompass encoding requirements, which are not even specified in the U.C.C. The encoding requirement at issue in this case, regarding the routing number of a depositary bank, is found in Regulation CC, which was issued by the Board of Governors of the Federal Reserve System to implement the Expedited Funds Availability Act. 12

U.S.C. §§ 4001–10.[4] As FNCB argues, it is unreasonable to interpret "sending" or "delivering" under U.C.C. § 4–301(d)(2) as incorporating the Reserve Bank's encoding provisions. The Reserve Bank encoding provisions have nothing to do with the manner of sending or delivering a check, but instead concern the conversion of a check into a "qualified returned check."[5] Banks are not required by the Reserve Bank to convert a check into a "qualified returned check." "Sending" or "delivering," on the other hand, is an applicable U.C.C. requirement, regardless of whether a check has been encoded. (*See* Def.'s Reply Br. at 10.) A finding that the encoding requirements are not incorporated into the midnight deadline rule is further supported by the existence of separate liability provisions covering encoding errors under both federal and state law.

### D. Federal Encoding Requirements and Applicable Liability Provisions

■ Regarding encoding, Federal Reserve Board Regulation CC, 12 C.F.R. pt. 229, provides as follows:

A paying bank may convert a check to a qualified returned check. A qualified returned check must be encoded in mag-

netic ink with the routing number of the depositary bank, the amount of the returned check, and a '2' in position 44 of the MICR [Magnetic Ink Character Recognition] line as a return identifier .... This paragraph does not affect a paying bank's responsibility to return a check within the deadlines required by the U.C.C.....

12 C.F.R. § 229.30(a)(2)(iii). There are no comparable requirements for encoding routing numbers in the Pennsylvania U.C.C. Regulation CC, as quoted above, explicitly states that the encoding requirements for routing numbers do not affect deadlines under the U.C.C. for a payor's bank return of a check.[6] Furthermore, the commentary found in 12 C.F.R. pt. 229, appendix E, explains that "[a] qualified returned check that contains an encoding error would still be a qualified returned check for purposes of [Regulation CC]." This statement strongly suggests that encoding errors are not meant to constitute failures to comply with the midnight deadline under the U.C.C.

Furthermore, Regulation CC contains its own liability standards for a violation of its requirements:

A bank shall exercise ordinary care and act in good faith in complying with the

---

**4.** For a general discussion on the interrelationship between the U.C.C. and Regulation CC with respect to the collection of checks, see E. Dwain Psencik, "NSF Check—Who Gets this Hot Potato," 51 Consumer Fin. L.Q. Rep. 223 (1997).

**5.** A "qualified returned check" is defined as "a returned check that is prepared for automated return to the depositary bank by placing the check in a carrier envelope or placing a strip on the check and encoding the strip or envelope in magnetic ink." 12 C.F.R. § 229.2(Blair–Bey). Conversion of a check to a "qualified returned check" enables high speed processing of the check. Encoding the check permits a payor bank to discharge its duty to return checks in an "expeditious manner," a duty that is separate and apart from

its duty to return the item by its U.C.C. midnight deadline. See E. Dwain Psencik, "NSF Check—Who Gets this Hot Potato," 51 Consumer Fin. L.Q. Rep. 223, 228 (1997). Conversion of a check to a qualified returned check may also enable the payor bank to pay a lower transaction fee imposed by the Reserve Bank. See Federal Reserve Regulatory Service 9–363.1

**6.** This is in contrast to a "returning bank," which receives a one-business day extension in its midnight deadline if it converts a check into a "qualified returned check." 12 C.F.R. § 229.31(a)(2)(iii). A "returning bank" is a bank that has handled the check in question other than a depositary or a payor bank. 12 C.F.R. § 229.2(cc).

requirements of this subpart [which includes Regulation CC]. A bank that fails to exercise ordinary care or act in good faith under this subpart may be liable to the depository bank, the depository bank's customer, the owner of a check, or another party to the check. The measure of damages for failure to exercise ordinary care is the amount of the loss incurred, up to the amount of the check, reduced by the amount of the loss that party would have incurred even if the bank had exercised ordinary care.

12 C.F.R. § 229.38(a). This separate liability standard of ordinary care for encoding requirements would be rendered meaningless if the encoding requirements were incorporated into the strict liability standard of 13 Pa. Cons.Stat. Ann. § 4302. NBT's position would subject all encoding errors to strict liability because such errors, according to NBT, would mean that the check has not been sent or delivered at all.[7] The Federal Reserve Board did not intend such strict liability because it requires a showing of actual harm resulting from violations of Regulation CC. Applying Regulation CC's measure of damages to the present case, NBT would not be able to recover anything because it suffered no loss from FNCB's encoding error.

### E. Encoding and Liability under the Pennsylvania U.C.C.

█ The Pennsylvania U.C.C. separately addresses the accuracy of encoding as follows:

(a) **Encoding warranty.**—A person who encodes information on or with respect to an item after issue warrants to any subsequent collecting bank and to the payor bank or other payor that the information is correctly encoded. . . .

\*   \*   \*   \*   \*   \*

(c) **Measure of damages for breach of warranty.**—A person to whom warranties are made under this section and who took the item in good faith may recover from the warrantor as damages for breach of warranty an amount equal to the loss suffered as a result of the breach, plus expenses and loss of interest incurred as a result of the breach.

13 Pa. Cons.Stat. Ann. § 4209. This separate liability provision covering encoding errors further suggests that requirements for encoding were not intended to be incorporated into the strict liability provision of 13 Pa. Cons.Stat. Ann. § 4302. *See U.S. Bank Nat'l Assoc. v. First Sec. Bank,* No. 97–CV–0789C, 2001 WL 741392, at \*3 (D.Utah April 3, 2001) (A bank's "breach of the encoding warranty does not make [the bank] strictly liable for the resulting . . . error . . . ."). Applying the liability standard of § 4209 to the present case, NBT would not be able to recover anything because it did not suffer actual damages as a result of the encoding error.

█ Furthermore, regarding the interaction between the U.C.C. and Federal Reserve regulations, the Pennsylvania U.C.C. provides as follows:

(a) **Variation by agreement.**—The effect of the provisions of this division may be varied by agreement, but the parties to the agreement cannot disclaim the responsibility of a bank for its lack of good faith or failure to exercise ordinary care or limit the measure of dam-

---

**7.** NBT's position would have the absurd result of still requiring a payor bank to "return" a check that has been erroneously encoded even after the check is no longer within the physical possession of the payor bank. FNCB no longer had physical possession of the disputed check once it sent it to the Reserve Bank on March 13, 2001. Even if FNCB had realized its encoding error prior to its midnight deadline, it was no longer possible for FNCB to "return" a check it no longer possessed, and it would be unreasonable to hold FNCB strictly liable for failing to "return" such a check.

ages for the lack or failure. However, the parties may determine by agreement the standards by which the responsibility of the bank is to be measured if those standards are not manifestly unreasonable.

**(b) Rules and regulations having effect of agreements.**—Federal Reserve regulations and operating circulars, clearinghouse rules and the like have the effect of agreements under subsection (a), whether or not specifically assented to by all parties interested in items handled.

13 Pa. Cons.Stat. Ann. § 4103.

In this case, Regulation CC forms part of the agreement among the parties with respect to the disputed check. Regulation CC requires a finding that an encoding error caused the depositary bank's loss in order to impose liability on the payor bank. NBT concedes that it cannot make such a showing.

In sum, Regulation CC and the Pennsylvania U.C.C. consistently indicate that actual damages resulting from the encoding errors are required to recover for such errors. Because there are no such damages in the present case, NBT cannot recover for FNCB's encoding error.

Courts in analogous contexts have declined to hold that an error under Federal Reserve Bank rules leads to automatic liability under U.C.C. § 4–302. For example, in *Colo. Nat'l Bank v. First Nat'l Bank & Trust Co.*, 459 F.Supp. 1366 (W.D.Mich.1978), the issue was whether the defendant, First National Bank & Trust Co., became "accountable" for the

face amount of returned checks, even though it physically returned the checks before the midnight deadline, due to its failure to give wire advice of nonpayment as required by Operating Circular No. 17 of the Federal Reserve. The plaintiff, Colorado National Bank, the depositary bank, sought to impose strict liability for the face amount of the checks by incorporating the wire advice requirements of the Federal Reserve into Michigan's U.C.C. § 4–302. The defendant argued that the wire advice requirement was subject only to a standard of ordinary care and that liability was limited to actual damages. The court ruled against the plaintiff. "The most compelling reason underlying the court's decision is the absence of any indication in Operating Circular No. 17 that the harsh result urged by plaintiff was intended." 459 F.Supp. at 1372. It noted the absence of several key terms, such as "revoke" (utilized in U.C.C. § 4–301) and "accountable" (utilized in U.C.C. § 4–302), in the language of the operating circular. "The court cannot interpret Operating Circular No. 17 as altering the acts or inaction which constitute final payment under the U.C.C. in the absence of language clearly indicating such an intent on the part of the Federal Reserve." 459 F.Supp. at 1372. *Accord Whalen & Sons Grain Co. v. Mo. Delta Bank*, 496 F.Supp. 211, 215 (E.D.Mo. 1980); *Bank of Wyandotte v. Woodrow*, 394 F.Supp. 550, 556–57 (W.D.Mo.1975); *Yeiser v. Bank of Adamsville*, 614 S.W.2d 338, 342–43 (Tenn.1981). In sum, courts have resisted attempts to incorporate Reserve Bank requirements into the bright line midnight rule.[8]

---

8. NBT relies on two cases in arguing that Regulation CC's encoding requirements should be incorporated into U.C.C. § 4–302, but neither is applicable to the present case. In *First Union Nat'l Bank of Fla. v. First Fla. Bank*, 616 So.2d 1168, 1169–70 (Fla.Dist.Ct. App.1993), the court delimited the issue as follows: "In this case, the parties do not

argue that the outcome is controlled by either federal reserve regulations or by the local clearinghouse rules.... Thus, we are called upon to apply ... [U.C.C. §§ 4–301, 4–302, as adopted in Florida], in context with other portions of the Uniform Commercial Code." The court did not address the applicability of separate liability provisions found in Regula-

In the present case, the encoding provisions of Regulation CC not only fail to use key terms such as "accountable" or "revoke," but they also explicitly state that the encoding requirements at issue "do[ ] not affect a paying bank's responsibility to return a check within the deadlines required by the U.C.C." 12 C.F.R. § 229.30(a)(2)(iii). Just as the wire notice provisions at issue in *Colo. Nat'l Bank* could not be incorporated into the midnight deadline rule, so too the Federal Reserve requirements at issue here are not incorporated into the strict liability provision of U.C.C. § 4–302.[9]

### IV. Conclusion

The Pennsylvania U.C.C. does not incorporate Regulation CC's encoding requirements into the strict liability standard of U.C.C. § 4–302. The midnight deadline focuses on the physical return of a check. Furthermore, Regulation CC and the U.C.C. contain separate provisions to address encoding errors which require actual damages resulting from such errors. In the present case, the parties stipulated that NBT did not suffer any actual damages as a result of FNCB's encoding error. Accordingly, Defendant FNCB's motion for summary judgment will be granted, and Plaintiff NBT's motion for summary judgment will be denied.[10] An appropriate Order follows.

### ORDER

**NOW, THIS 17th DAY OF OCTOBER, 2003,** for the reasons set forth in the foregoing Memorandum, **IT IS HEREBY ORDERED THAT:**

1. Defendant's Motion for Summary Judgment (Dkt. Entry 15) is **GRANTED.**

2. Plaintiff's Motion for Summary Judgment (Dkt. Entry 17) is **DENIED.**

3. The Clerk of Court is directed to enter judgment in favor of Defendant, and to mark this matter **CLOSED.**

---

tion CC or U.C.C. § 4103, and because the case did not involve encoding, it also did not address U.C.C. § 4–209. FNCB in the present case explicitly has argued for the applicability of the liability provisions in Regulation CC and U.C.C. § 4103. In *Brown v. Lee County Bank*, 501 So.2d 702 (Fla.Dist.Ct.App. 1987), the court does not even mention the possible applicability of federal reserve regulations to the alleged mislabeling of an envelope.

9. In addition to the return of the check, a payor bank may avoid liability if, prior to its midnight deadline, it "sends written notice of dishonor or nonpayment if the item is unavailable for return." 13 Pa. Cons.Stat. Ann. § 4301(a)(2). It is undisputed that FNCB gave timely written notice of dishonor to NBT. This means of extinguishing liability, however, is only applicable when "the item is unavailable for return." *See, e.g., Colo. Nat'l Bank v. First Nat'l Bank & Trust Co.*, 459 F.Supp. 1366, 1369 (W.D.Mich.1978) ("Written notice of dishonor before the payor bank's midnight deadline constitutes revocation of a provisional settlement only where the item is unavailable."). In this case, the disputed check was still available for return before FNCB sent it to the Reserve Bank, so FNCB's liability would not have been extinguished by a timely notice of dishonor. It could be argued, however, that once the disputed check left the control of FNCB with the encoding error, it was no longer available for return, so that the written notice of dishonor should be viewed as effective. There is no need to consider this argument because the encoding error did not render the return of the check untimely.

10. In light of this holding, it is unnecessary to address FNCB's challenges to liability under 13 Pa. Cons.Stat. Ann. § 4302 on the grounds of unjust enrichment or denial of due process.