

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-30-2004

# NBT Bank NA v. First Natl Comm Bank

Precedential or Non-Precedential: Precedential

Docket No. 03-4231

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"NBT Bank NA v. First Natl Comm Bank" (2004). *2004 Decisions.* Paper 1.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/1

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL


IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No:  03-4231

NBT BANK, NATIONAL ASSOCIATION,

Appellant

v.

FIRST NATIONAL COMMUNITY BANK


_____


On Appeal from the United States District Court
for the Middle District of Pennsylvania
District Court No. 01-CV-00936
District Judge: The Honorable Thomas I. Vanaskie, C.J.


_____


Argued September 28, 2004


_____


Before: RENDELL, FUENTES and SMITH, *Circuit Judges*

(Filed: December 30, 2004)
_____

OPINION OF THE COURT
_____


COUNSEL:  Robert J. Tribeck, Esq. (Argued)
          Rhoads & Sinon, LLP
          One South Market Square
          P.O. Box 1146
          Harrisburg, PA 17108-1146
          *Attorney for Appellant*

          Raymond P. Pepe, Esq.,
          David R. Overstreet, Esq. (Argued),
          and Marsha A. Sajer, Esq.
          Kirkpatrick & Lockhart, LLP
          240 North Third Street
          Harrisburg, PA 17101
          *Attorneys for Appellee*

SMITH, *Circuit Judge*.

This is an appeal from an order of the District Court denying the motion of Appellant NBT Bank, N.A. ("NBT") for summary judgment, and granting summary judgment in favor of Appellee First National Community Bank ("FNCB"). At issue is a claim by NBT under Article 4 of Pennsylvania's Uniform Commercial Code ("UCC"), 13 Pa. Cons. Stat. Ann.

2

§§ 4101-4504, seeking to recover the face value of a $706,000 check (the "Disputed Check") that was drawn on an FNCB account and deposited at NBT by a participant in a check-kiting scheme.

In accordance with its established practice, NBT forwarded the Disputed Check to the Federal Reserve Bank of Philadelphia ("Reserve Bank"), which serves as a clearinghouse or transferor for checking transactions involving a number of banks, including both NBT and FNCB. When the Disputed Check was presented by the Reserve Bank to FNCB for payment, FNCB recognized that the drawer had overdrawn its account. Thus, FNCB sought to dishonor the Disputed Check and to return it to the Reserve Bank. Under the UCC, FNCB was required to return the Disputed Check to the Reserve Bank prior to the "midnight deadline," defined as midnight of the following banking day after the day the check was first presented to FNCB.

The parties agree that the Disputed Check was physically delivered to the Reserve Bank prior to the midnight deadline. The parties also agree that FNCB prepared the Disputed Check as a "qualified return check," meaning it was to be encoded with a magnetic strip containing information that would facilitate automated processing by the Reserve Bank. However, FNCB erroneously encoded the magnetic strip with the routing number for PNC Bank (which otherwise has no connection to this appeal), rather than NBT. The

3

parties agree that NBT did not suffer damages as a result of this encoding error. Nonetheless, NBT seeks to hold FNCB accountable for the full amount of the Disputed Check, pursuant to the strict accountability provisions of §§ 4301 and 4302 of the UCC. The key issue in this appeal is whether FNCB's violation of a Federal Reserve regulation requiring proper encoding provides a basis for imposing strict accountability on FNCB under § 4302 of the UCC, despite the fact that NBT incurred no actual loss as a result of FNCB's error.

Because we believe the District Court correctly concluded that NBT may not recover on the facts presented here, we will affirm the District Court's order granting summary judgment in favor of FNCB.

## I.    FACTUAL BACKGROUND

### A.    The Disputed Check

In the proceedings before the District Court, the parties stipulated to the facts. The dispute arises out of a check-kiting scheme under which a small group of Pennsylvania business entities arranged to write checks on one account, drawing on non-existent funds, and then cover these overdrafts with checks drawn on another account that also lacked sufficient funds. In this manner, the perpetrators of the scheme sought to obtain funds to which they were not

4

entitled. The scheme collapsed when three checks initially deposited at NBT, and subsequently presented for payment to FNCB, were discovered by FNCB to have been drawn on an FNCB account that lacked sufficient funds.[1] There is no dispute between the parties that two of these three checks were properly returned by FNCB to the Reserve Bank prior to the applicable midnight deadline.

The Disputed Check (i.e., the third check, for $706,000), was drawn on an FNCB account and drafted by an entity called Human Services Consultants, Inc. On March 8, 2001, the Disputed Check was proffered for deposit at NBT by an entity called Human Services Consultants Management, Inc., d/b/a "PA Health." Thus, in relation to the Disputed Check, NBT was the "depositary bank" (the first to receive the item), and FNCB was the "payor bank," meaning that the Disputed Check was drawn on an FNCB account held by a participant in the check-kiting scheme.

---

[1]The record does not provide additional information concerning the details of the check-kiting scheme and the fate of the scheme's perpetrators. However, at oral argument, counsel for NBT indicated that the funds that were fraudulently obtained by the scheme's perpetrators have not been recovered by NBT.

## B. The Provisional Settlement

After the Disputed Check was presented for deposit at NBT, the bank gave provisional credit to the depositor, PA Health, for the amount of the Disputed Check. NBT also transmitted the Disputed Check to the Reserve Bank for presentment to FNCB. Upon transmission to the Reserve Bank, NBT was given a provisional credit from FNCB's Reserve Bank account for the face amount of the Disputed Check.[2] The Reserve Bank then forwarded the Disputed Check to FNCB, and FNCB received it on March 12, 2001. Under the UCC, if FNCB wished to refuse payment on the Disputed Check, FNCB was obligated to revoke the provisional settlement granted to NBT by 11:59 p.m. on March 13, 2001.[3] *See* 13 Pa. Cons. Stat. Ann. §§ 4301, 4215.

---

[2]The Reserve Bank was acting as a clearinghouse or transferor bank for items moving between other banks, including FNCB and NBT. The Reserve Bank's services are used to facilitate prompt payment, accurate accounting, and expedited availability of funds.

[3]A brief summary of the provisional credit process under the UCC may aid understanding of the issues raised in this appeal. Article 4 of the UCC provisionally assumes that when a check is deposited for payment, it will be paid by its drawer. *See* 13 Pa. Cons. Stat. Ann. §§ 4201(a), 4214(a), 4215(a)(2), 4301. *See generally* 1 Barkley Clark & Barbara Clark, THE LAW OF BANK DEPOSITS, COLLECTIONS AND CREDIT CARDS, § 6.01 (5th ed.

6

## C. FNCB's Efforts To Return The Disputed Check

On March 13, 2001, FNCB determined it would not pay the Disputed Check because of the absence of sufficient funds in the account on which the check was drawn. That same day, FNCB sought to return the Disputed Check to NBT through the Reserve Bank. The parties agree that the Disputed Check was physically delivered to the Reserve Bank prior to 11:59 p.m. on March 13. In addition to sending the Disputed Check back to the Reserve Bank on March 13,

---

1999) (hereinafter "Clark & Clark") (outlining the provisional credit process). Based upon this assumption, the depositary bank provisionally places the value of the check into the payee's account and forwards the check to the clearinghouse or transferor bank for collection. The clearinghouse provisionally shifts the value of the check from the clearinghouse account of the payor bank to the clearinghouse account of the depositary bank. Unless the payor bank revokes the provisional credit in accordance with § 4301 of the Pennsylvania UCC, the payor bank is deemed to have finally paid the check and is accountable to the depositary bank for the full amount of the check. *See* 13 Pa. Cons. Stat. Ann. §§ 4215, 4302; *see also Colorado Nat'l Bank v. First Nat'l Bank & Trust Co.*, 459 F. Supp. 1366, 1368-69 (W.D. Mich. 1978) (discussing provisional credit process); *Channel Equip. Co. v. Cmty. State Bank*, 996 S.W.2d 374, 377-78 (Tex. Ct. App. 1999) (same).

FNCB also sent a notice of dishonor to NBT via the FedLine,[4] in which FNCB indicated that it did not intend to pay the Disputed Check. NBT received this notice prior to the close of business on March 13. In addition, on the morning of March 14, 2001, FNCB executives telephoned NBT officials and telefaxed a letter to NBT, advising NBT that FNCB had decided to dishonor the Disputed Check.

### D. FNCB's Encoding Error

When FNCB sent the Disputed Check to the Reserve Bank on March 13, 2001, FNCB included a letter designating it as a "Qualified Return Check" prepared for high speed processing.[5] In so doing FNCB communicated to the Reserve Bank that it had attached to the Disputed Check a strip of paper encoded with magnetic ink that would permit the check to be processed through the Reserve Bank's automated processing system. However, FNCB erroneously encoded the strip with the routing number for PNC Bank instead of the routing number for NBT.

---

[4]The FedLine is a telecommunications service provided by the Federal Reserve for the purpose of, among other things, sending notices of dishonor.

[5]Banks may convert checks to qualified return checks in order to expedite processing and save on per-check processing fees. *See* 12 C.F.R. § 229.30(a).

In sum, the Reserve Bank physically received the Disputed Check complete with the wrongly encoded strip prior to 11:59 p.m. on March 13, 2001. Because the Disputed Check was improperly encoded, NBT did not receive it back from the Reserve Bank until March 16, 2001. With proper encoding the Disputed Check likely would have been received on March 14, 2001. The parties have stipulated, however, that NBT suffered no damages or actual loss as a result of the encoding error, inasmuch as NBT had actual notice from FNCB on March 13 that the Disputed Check had been dishonored.[6]

## II.     THE DISTRICT COURT PROCEEDINGS

NBT instituted this action against FNCB on May 25, 2001. The only claim before the District Court was a claim under the Pennsylvania UCC. NBT claimed that FNCB's

---

[6]After receiving the Disputed Check on March 16, 2001, NBT sent it back to the Reserve Bank as a "Late Return" on March 26, 2001. Upon receiving notice of NBT's actions, FNCB submitted to the Reserve Bank a "Paying Bank Response to Claim of Late Return," in which it certified that it had returned the Disputed Check prior to the applicable March 13, 2001 midnight deadline. Following this exchange, the Reserve Bank reversed the provisional credit of $706,000 that it had originally given to NBT when NBT first forwarded the Disputed Check to the Reserve Bank on March 13.

encoding error meant FNCB had failed to return the Disputed Check prior to the midnight deadline as required by the UCC, and that FNCB was therefore accountable to NBT for the full amount of the Disputed Check. The parties stipulated to the facts and filed cross-motions for summary judgment.

The District Court granted FNCB's motion and denied NBT's motion. *See NBT Bank v. First Nat'l Comm. Bank*, 287 F. Supp. 2d 564 (M.D. Pa. 2003). The District Court found that FNCB had returned the Disputed Check by the March 13 midnight deadline as required by § 4301, that FNCB's encoding error did not negate or nullify what otherwise constituted proper return as defined in § 4301(d), and that, in any event, NBT could not recover where it suffered no actual loss resulting from FNCB's conduct. The District Court reasoned that (1) the Reserve Bank was not a "clearinghouse" as that term is used in § 4301(d)(1), thus rendering that particular UCC provision inapplicable; (2) FNCB's encoding error did not negate FNCB's compliance with the UCC midnight deadline rule under § 4301(d)(2), which provides that an item is returned by a payor bank "when it is sent or delivered to the bank's customer or transferor [here, the Reserve Bank] or pursuant to his instructions[;]" and (3) NBT could not recover where it suffered no loss as a result of FNCB's conduct, and where, by operation of law, NBT and FNCB were parties to a binding agreement that incorporated federal regulations indicating that the measure of damages for a failure to exercise ordinary care

10

in encoding was to be measured by the actual loss incurred.
NBT appeals.

## III.  DISCUSSION

### A.  Jurisdiction and Standard of Review

Federal court jurisdiction over this diversity action is
proper under 28 U.S.C. § 1332.  We have appellate
jurisdiction pursuant to 28 U.S.C. § 1291.  We review the
District Court's decision to grant summary judgment under
our plenary standard of review.  *See Curley v. Klem*, 298 F.3d
271, 276 (3d Cir. 2002); *Chase Manhattan Bank, N.A. v.
Government of the Virgin Islands*, 300 F.3d 320, 322 (3d Cir.
2002).  Affirming the grant of summary judgment is proper
where there are no genuine issues of material fact and the
moving party is entitled to judgment as a matter of law.  *See
Curley*, 298 F.3d at 276-77 (quoting Fed. R. Civ. P. 56).

### B.  Pennsylvania UCC Provisions Governing
### Check-Return Procedures

Article 4 of the UCC as adopted by Pennsylvania
defines the rights between parties with respect to bank
deposits and collections involving banks located in
Pennsylvania.  *See* 13 Pa. Cons. Stat. Ann. § 4102(b).  To the
extent not preempted or superseded by federal law, Article 4
governs the process by which banks present checks for

11

payment, settle on checks, and, if necessary, dishonor and return checks. NBT notes three interrelated UCC provisions that establish the circumstances under which a bank may return a dishonored check.

The first key provision is § 4301. Section 4301(a) provides that a bank may dishonor or return a check or other disputed item if, before the bank's midnight deadline, it either (1) returns the item; or (2) sends written notice of dishonor or nonpayment if the item is unavailable for return. 13 Pa. Cons. Stat. Ann. § 4301(a)(1)-(2). Section 4301(d) defines the ways in which a bank may "return" an item for purposes of compliance with § 4301(a)(1). Section 4301(d) provides:

> **Acts constituting return of item.** – An item is returned:
>
> (1) as to an item presented through a clearinghouse, when it is delivered to the presenting or last collecting bank or to the clearinghouse or is sent or delivered in accordance with clearinghouse rules; or
>
> (2) in all other cases, when it is sent or delivered to the bank's customer or transferor or pursuant to his instructions.

13 Pa. Cons. Stat. Ann. § 4301(d)(1)-(2). Notably, the UCC defines the terms "delivery" and "send." "Delivery" with respect to "instruments, documents of title, chattel paper or

12

certificated securities means voluntary transfer of possession." 13 Pa. Cons. Stat. Ann. § 1201. "Send,"

> [i]n connection with any writing or notice, means to deposit in the mail or deliver for transmission by any other usual means of communication with postage or cost of transmission provided for and properly addressed and[,] in the case of an instrument[,] to an address specified thereon or otherwise agreed, or[,] if there be none[,] to any address reasonable under the circumstances. The receipt of an item or notice within the time at which it would have arrived if properly sent has the effect of a proper sending.

*Id.*

The second key UCC provision with respect to a payor bank's attempt to dishonor a check is § 4302. Section 4302 provides in relevant part that:

> [i]f an item is presented to and received by a payor bank[,] the bank is accountable for the amount of [the item], whether properly payable or not, if the bank . . . retains the item beyond midnight of the banking day of receipt without settling for it or . . . does not pay or return the item or send notice of dishonor until after its midnight deadline.

13 Pa. Cons. Stat. Ann. § 4302(a)(1). Section 4302 thus imposes strict accountability on a payor bank (subject to two

13

enumerated defenses not relevant here) that fails to revoke its provisional settlement on a dishonored check prior to the midnight deadline. *See Chrysler Credit Corp. v. First Nat'l Bank & Trust Co. of Wash.*, 746 F.2d 200, 201 (3d Cir. 1984) (*per curiam*) (interpreting Pennsylvania law); *Lombardo v. Mellon Bank, N.A.*, 685 A.2d 595, 598 (Pa. Super. Ct. 1996); *Nat'l Check v. First Fid. Bank*, 658 A.2d 1375, 1378 (Pa. Super. Ct. 1995);; *see also First Union Nat'l Bank of Fla. v. First Fla. Bank, N.A.*, 616 So.2d 1168, 1171 (Fla. Dist. Ct. App. 1993) (noting that in most states "it is well established that sections 4-301 and 4-302 of the Uniform Commercial Code create a statutory doctrine of strict accountability by the payor bank to the presenting bank if notice is not accomplished within the midnight deadline") (citing *L.A. Nat'l Bank v. Bank of Canton of California*, 280 Cal. Rptr. 831 (Cal. Ct. App. 1991); *First State Bank of Sherwood v. Twin City Bank of North Little Rock*, 720 S.W.2d 295 (Ark. 1986); *Northwestern Nat'l Insurance Co. v. Midland Nat'l Bank*, 292 N.W.2d 591 (Wis. 1980)).

The third UCC provision invoked by NBT is § 4215, which addresses when a check is "finally paid." Upon "final payment" a provisional settlement by the payor bank becomes final, and the payor bank is accountable for the face amount of the check. Under § 4215, a check "is finally paid by a payor bank when the bank has . . . made a provisional settlement for the item and fail[s] to revoke the settlement in the time and manner permitted by statute, clearinghouse rule

14

or agreement." 13 Pa. Con. Stat. Ann. § 4214 (a)(3). Official Comment 4 to § 4215 states that "[a] primary example of a statutory right on the part of the payor bank to revoke a settlement is the right to revoke conferred by Section 4-301."[7]

## C.  Regulation CC, Reserve Bank Operating Circulars, and Variation By Agreement

The Pennsylvania UCC provisions governing check-return procedures do not operate in a vacuum. Federal law forms part of the legal framework within which check-processing activities take place. Of particular relevance to this appeal are the 1988 regulations adopted by the Federal Reserve implementing the Expedited Funds Availability Act, 12 U.S.C. §§ 4001-4010. *See* 12 C.F.R. Pt. 229. These regulations, referred to collectively as "Regulation CC," complement but do not necessarily replace the requirements of Article 4 of the UCC. *See* 12 C.F.R. § 229.41.

Subpart C of Regulation CC, 12 C.FR. §§ 229.30-229.43, applies to and governs the collection, processing, and return of checks. *See* 12 C.F.R. § 229.1(b)(3). The provisions of subpart C "supersede any inconsistent

_____

[7]Under Pennsylvania law, the official comments of a drafting commission may be given weight in the construction of a statute. *See Young v. Kaye*, 279 A.2d 759, 765 n.3 (Pa. 1971).

provisions of the UCC as adopted in any state, or of any other state law, but only to the extent of the inconsistency." 12 C.F.R. § 229.41; *see also* 13 Pa. Cons. Stat. Ann. § 4103, cmt. 3. Regarding encoding, subpart C provides:

> A paying bank may convert a check to a qualified return check. A qualified returned check must be encoded in magnetic ink with the routing number of the depositary bank, the amount of the returned check, and a '2' in position 44 of the MICR [Magnetic Ink Character Recognition] line as a return identifier.

12 C.F.R. § 229.30(a)(2)(iii).

Subpart C of Regulation CC also contains its own liability standard and its own remedy provision for a failure to comply with its requirements:

> A bank shall exercise ordinary care and act in good faith in complying with the requirements of this subpart [,which includes the encoding requirements referenced above]. A bank that fails to exercise ordinary care or act in good faith under this subpart may be liable to the depositary bank, the depositary bank's customer, the owner of a check, or another party to the check. The measure of damages for failure to exercise ordinary care is the amount of the loss incurred, up to the amount of the check, reduced by the amount of the loss that party would have incurred even

16

if the bank had exercised ordinary care.

12 C.F.R. § 229.38(a).

Along with Regulation CC, the Federal Reserve has adopted Operating Circulars utilized by Reserve Banks in connection with their check-processing services. Both Regulation CC and Federal Reserve Operating Circular No. 3 (which contains provisions relevant to this appeal), "apply to the handling of all cash items that [Reserve Banks] accept for collection and all returned checks that [Reserve Banks] accept for return." *See* Federal Reserve Op. Circ. No. 3 (Jan. 2, 1998), at 1, ¶ 1.1. The opening section of Operating Circular No. 3 also states:

> This Circular is issued pursuant to Sections 4, 13, 14(e), and 16 of the Federal Reserve Act, the Expedited Funds Availability Act, and related statutes and in conformance with Regulations J and CC. It is binding on each party interested in an item we handle. The provisions of this Circular vary by agreement any inconsistent provisions of the Uniform Commercial Code or of Regulation CC, but only to the extent of the inconsistency.

*Id.*

Operating Circular No. 3 is not the original source of the encoding requirement at the center of this appeal, which

17

instead is set forth in subpart C of Regulation CC, as noted above. However, Operating Circular No. 3 emphasizes that in handling a "qualified return check" the Reserve Bank may rely on the accuracy of "the identification of the depositary bank by routing number in magnetic ink." *See* Federal Reserve Op. Circ. No. 3, at 10, ¶ 15.6. Circular No. 3 further provides that the payor bank will indemnify the Reserve Bank for any loss or expense incurred by the Reserve Bank arising from an encoding error by the payor bank. *See id.* Circular No. 3 also notes that if for any reason a returned check is mistakenly forwarded by the Reserve Bank to the wrong depositary bank, the recipient should either send the returned check directly to the proper depositary bank or promptly return it to the Reserve Bank. *See id.* at 11, ¶ 15.12.

The Pennsylvania UCC also addresses the applicability of the federal regulatory provisions contained in Regulation CC and Operating Circular No. 3. Section 4103(a) of the UCC directs that the terms of the UCC may be varied by agreement, although parties cannot disclaim the duty to act in good faith and exercise ordinary care or limit the measure of damages for a failure to exercise ordinary care. Section 4103(b) states that "Federal Reserve regulations and operating circulars, clearinghouse rules and the like have the effect of agreements under subsection (a), whether or not specifically assented to by all parties interested in items handled." Section 4103(c) notes that a bank's compliance with Federal Reserve regulations and operating circulars constitutes prima facie

18

evidence of the exercise of ordinary care.

In sum, under the UCC, the provisions of Regulation CC function as a binding agreement between the parties with respect to check-return transactions. This agreement supersedes any inconsistent provisions of the UCC itself, but only to the extent of the inconsistency. Similarly, the provisions of Operating Circular No. 3 are also binding on the parties in connection with the check-return activities at issue here. The rights and obligations granted and imposed by Operating Circular No. 3 overlap to a certain extent with the parties' rights and obligations under the UCC's statutory provisions and under Regulation CC. The provisions of Operating Circular No. 3 take precedence over any inconsistent portions of Regulation CC, but only to the extent of the inconsistency.

## D.     Construing The UCC's Check-Return Provisions

NBT's claim raises a number of difficult questions of statutory construction under the UCC. An understanding of these issues aids in assessing the underlying theory of NBT's claim. Nonetheless, we ultimately conclude that even if these questions were to be resolved in NBT's favor, it would not change the outcome here. Thus, while our discussion may provide additional clarity concerning the issues implicated by NBT's appeal, we need not definitively resolve all the

19

disputes between the parties concerning the construction of the UCC's check-return provisions.

As noted above, NBT invokes three interrelated UCC provisions governing the circumstances under which a bank may return a dishonored check. Section 4301(d) defines the acts that constitute "return" of an item. The parties dispute whether it is § 4301(d)(1) or § 4301(d)(2) that applies under the facts in this case. The District Court found that § 4301(d)(2) applied, ruling that the Reserve Bank was a "transferor" rather than a "clearinghouse." We need not resolve this issue, because our analysis concerning the encoding requirement invoked by NBT is the same, regardless of whether the encoding requirement is viewed as a clearinghouse rule under § 4301(d)(1) or a transferor instruction under § 4301(d)(2).

Under § 4301(d)(1), an item is deemed returned "when it is delivered . . . to the clearinghouse *or* is sent or delivered in accordance with clearinghouse rules." 13 Pa. Cons. Stat. Ann. § 4301(d)(1) (emphasis added). Under § 4301(d)(2), an item is returned "when it is sent or delivered to the bank's . . . transferor *or* pursuant to his instructions." 13 Pa. Cons. Stat. Ann. § 4301(d)(2) (emphasis added). The phrasing of these sections is disjunctive, and here the parties agree that the Disputed Check was dispatched by FNCB on March 13, 2001, and was physically delivered to the Reserve Bank prior to the March 13 midnight deadline. Under one reading of §

20

4301(d), this would end the inquiry, because the Disputed Check was "delivered" to the clearinghouse or transferor prior to the midnight deadline. NBT challenges this reading, arguing that § 4301(d)'s references to simple delivery as constituting a valid "return" are relevant only where there are no applicable clearinghouse rules or transferor instructions that govern sending or delivery. NBT argues that only this construction gives effect to all the terms of § 4301(d), including the simple delivery option as well as delivery "in accordance with clearinghouse rules" or "pursuant to [transferor] instructions."

However, at least two other possible interpretations would give effect to § 4301(d)'s references to clearinghouse rules and transferor instructions while also maintaining the viability of the simple delivery option. First, the phrases "sent or delivered in accordance with clearinghouse rules" and "sent or delivered . . . pursuant to [transferor] instructions" could be read as referring to instances where a disputed item is to be returned to some address other than the clearinghouse or transferor from which it was initially received. Second, these phrases may also be meant to account for situations in which a payor bank attempts to deliver a disputed item to the clearinghouse or transferor, but through negligence of the clearinghouse or transferor the disputed item does not actually

21

arrive at the proper location.[8]

The multiple possible readings of § 4301(d) illustrate that even when the UCC's check-return provisions are considered in isolation from Regulation CC, NBT is not bound to recover on its claim for strict accountability. Similarly, even if NBT is correct in arguing that FNCB was obligated to comply with certain clearinghouse rules or transferor instructions in order to satisfy § 4301(d), it is not clear that the encoding requirement for returned checks is a rule that relates to "sending" or "delivery" under the UCC. Indeed, the District Court found that "the midnight deadline rule focuses on timing and a physical transfer." *NBT Bank*, 287 F. Supp. 2d at 571. The UCC defines "delivery" as "voluntary transfer of possession." 13 Pa. Cons. Stat. Ann. § 1201. Even if the encoding requirement is a rule or instruction that FNCB was bound to follow, such a rule does not necessarily relate to the question of whether FNCB voluntarily transferred possession of the Disputed Check from itself to the Reserve Bank prior to the midnight deadline.[9]

---

[8]The most obvious example of such a situation would be where a clearinghouse or transferor had provided a payor bank with an inaccurate return address.

[9]Likewise, § 4215's requirement that a provisional settlement be revoked in the "time and manner permitted by statute, clearinghouse rule or agreement" does not necessarily support

22

Thus, FNCB's failure to comply with such a rule or instruction would not necessarily preclude a finding under § 4301(d) that FNCB returned the Disputed Check prior to the midnight deadline.

While the foregoing issues concerning the proper construction of the UCC's check-return provisions need not be definitively resolved, it is clear that NBT's interpretation poses numerous difficulties. We may nonetheless assume that if the UCC provisions are read in isolation from Regulation CC, FNCB was obligated to encode the Disputed Check correctly in order to effectively "return" it within the meaning of § 4301(d). We may further assume that a failure to do so by FNCB would mean FNCB had not properly revoked its provisional settlement in a manner permitted under § 4215.

the position taken by NBT. The encoding requirement invoked by NBT arises in the context of Regulation CC's instructions for preparing a check as a "qualified return check." Regulation CC's encoding provision does not specifically indicate that accurate encoding is a prerequisite for proper revocation of a provisional settlement under the UCC. *See Col. Nat'l Bank*, 459 F. Supp. at 1371-73 (citing the absence of language concerning revocation and strict accountability in the Federal Reserve regulation requiring wire advice of nonpayment, and holding that the payor bank's failure to comply with wire advice requirement was not sufficient grounds for imposing strict accountability under § 4302 of the UCC); *Yeiser v. Bank of Adamsville*, 614 S.W.2d 338, 342-43 (Tenn. 1981) (same).

23

This assumption would lead to the conclusion that under the UCC, the Disputed Check was "finally paid" by FNCB, thus rendering FNCB accountable to NBT for the full amount of the Disputed Check pursuant to § 4302. In the end, however, such assumptions do not change the result, because, as set forth in part III.E below, the UCC's check-return provisions do not operate in a vacuum. Even if NBT's interpretation of the UCC's check-return provisions is correct, Regulation CC and Operating Circular No. 3 preclude NBT from holding FNCB strictly accountable for the Disputed Check where NBT suffered no actual loss as a result of FNCB's encoding error.

> ### E. The Damage Limitations Included In Regulation CC And Incorporated In Operating Circular No. 3 Preclude NBT From Recovering On Its UCC Claim

NBT argues that under § 4301(d) of the UCC, FNCB's encoding error effectively nullifies FNCB's efforts to "return" the Disputed Check. NBT contends that Regulation CC's encoding requirement for qualified return checks is a clearinghouse rule or transferor instruction concerning the manner in which the Disputed Check was to be returned. NBT argues that FNCB's failure properly to comply with such a rule or instruction means that (1) FNCB did not revoke its provisional settlement in the "manner permitted by statute, clearinghouse rule or agreement[,]" as required by § 4215;

24

and (2) the Disputed Check was not returned prior to the midnight deadline as required under § 4301.  Thus, according to NBT, FNCB is strictly accountable for the full amount of the Disputed Check pursuant to § 4302.

FNCB counters that, because *all* of Regulation CC is binding on the parties (pursuant to both Regulation CC's own terms, and  as an "agreement" under § 4103 of the UCC), NBT may not rely on FNCB's encoding error as a basis for recovering the amount of the Disputed Check.  FNCB notes that Regulation CC specifies that damages for a bank's failure to exercise ordinary care in fulfilling its obligations under Regulation CC must be calculated based upon the actual loss caused by such failure.  Implicit in FNCB's position is the concession that it failed to exercise ordinary care in encoding the Disputed Check.  FNCB argues that, even if NBT's reading of the UCC is correct (a proposition FNCB disputes), Regulation CC has effectively amended §§ 4215, 4301, and 4302 of the UCC to preclude strict accountability where a payor bank's failure to return an item by the midnight deadline is based solely on the payor bank's noncompliance with an obligation imposed by Regulation CC.  Instead, according to FNCB, where a payor bank's violation of a clearinghouse rule or transferor instruction arises solely from its failure to exercise ordinary care in executing its obligations under Regulation CC, Regulation CC's clause tying the measure of damages to a claimant's actual loss is incorporated into the UCC by operation of section 4103.  FNCB contends

this analysis precludes imposition of strict accountability in situations where, as here, the claimant seeking recovery concedes it suffered no loss as a result of the payor bank's actions.

We believe the District Court's analysis of this issue, which is largely consistent with FNCB's position, is correct. Regulation CC indisputably binds the parties, pursuant to both its own terms, *see* 12 C.F.R. § 229.1(b)(3), as well as § 4103 of the UCC, which indicates that "Federal Reserve regulations" are to be treated as agreements that may vary the terms of the UCC, *see* 13 Pa. Cons. Stat. Ann. § 4103(a)-(b). Such agreements are binding "whether or not specifically assented to by all parties interested in items handled." 13 Pa. Cons. Stat. Ann. § 4103(b). Thus, the District Court properly held that "[i]n this case, Regulation CC forms part of the agreement among the parties with respect to the disputed check." *NBT Bank*, 287 F. Supp. 2d at 574.

Because Regulation CC *as a whole* is binding on the parties, and because Regulation CC is the source of the encoding requirement invoked by NBT, the extent of FNCB's liability for its encoding error must be measured by the standards set forth in Regulation CC. *See Bank of Wyandotte v. Woodrow*, 394 F. Supp. 550, 556-57 (W.D. Mo. 1975) (noting that Federal Reserve regulations are "controlling and enforceable" as agreements under the UCC, and, that the measure of damages for violation of such regulations is "the

26

amount of the item reduced by an amount which could not have been realized even if all [applicable] requirements had been met") (internal quotations omitted).  Regulation CC states that a bank that fails to exercise ordinary care in complying with the provisions of subpart C of Regulation CC (which includes the encoding requirement referenced above) "may be liable" to the depositary bank.  Then, in broad, unrestricted language, Regulation CC states:

> The measure of damages for failure to exercise ordinary care is the amount of the loss incurred, up to the amount of the check, reduced by the amount of the loss that the [plaintiff bank] would have incurred even if the [defendant] bank had exercised ordinary care.

12 C.F.R. § 229.38(a).  This provision does not provide an exception to this standard for measuring damages in instances where noncompliance with Regulation CC is alleged to have resulted in noncompliance with the UCC's midnight deadline rule.  Here, the parties have stipulated that NBT suffered no loss as a result of FNCB's encoding error.  Thus, under the plain language of Regulation CC, NBT may not recover from FNCB for the amount of the Disputed Check.

This analysis is reinforced by Appendix E to Regulation CC, which contains the Federal Reserve Board's commentary interpreting the provisions of Regulation CC and providing examples "to aid in understanding how a particular

27

requirement is to work." 12 C.F.R. Part 229, App. E, § I, A, 1. Appendix E states:

> Generally, under the standard of care imposed by § 229.38, a paying or returning bank would be liable for *any damages incurred due to misencoding of the routing number*, the amount of the check, or return identifier on a qualified return check . . . . A qualified return check that contains an encoding error would still be a qualified return check for purposes of the regulation.

*Id.* at § II, BB, 2 (emphasis added). This Reserve Board commentary is significant, because as noted above, both Regulation CC and the UCC indicate that Regulation CC's provisions are binding on the parties, and that Regulation CC's provisions supersede any inconsistent provisions of the UCC. The fact that Appendix E specifically contemplates the possibility that a payor bank could encode a returned check with the wrong routing number, and yet states that the remedy for such an error is to be calculated based upon the damages caused by the error, strongly indicates that encoding errors do not give rise to strict accountability for a payor bank.

Notably, Appendix E also states that a wrongly encoded check is still considered a qualified return check. This statement illustrates that there is a distinction between whether a check has been properly encoded and whether a check has been properly returned. NBT's attempt to

28

incorporate the proper encoding of a routing number as an essential element in determining whether a check has been "returned" under § 4301 of the UCC is contrary to the approach required under Regulation CC. Thus, FNCB's encoding error, while constituting a violation of Regulation CC's encoding requirements, does not provide an adequate basis for imposing strict accountability on FNCB pursuant to the UCC's midnight deadline provisions.

NBT offers two reasons why it believes it should recover the full amount of the Disputed Check notwithstanding the measure of damages specified in Regulation CC. We find that these arguments lack merit. NBT's primary argument challenges the applicability of the Regulation CC provision concerning calculation of damages based upon actual loss. NBT believes this provision has no relevance because NBT's claim is brought under the UCC rather than under Regulation CC. NBT states, "[w]hether or not [FNCB] would have been liable on a claim under Regulation CC is wholly irrelevant to the issue presented here. The issue here is whether [FNCB] is accountable under the UCC[.]"

There are several problems with NBT's attempt to draw a sharp distinction between a claim "under the UCC" and a claim covered by Regulation CC. It is obvious that NBT's UCC claim is at least partially dependent on Regulation CC, in that Regulation CC is the source of the

29

encoding requirement that directs a payor bank to include the routing number of the depositary bank in magnetic ink on all qualified return checks. Indeed, to the extent the UCC itself addresses encoding, it specifically provides that the measure of damages for an encoding error is the actual loss incurred by the claimant. *See* 13 Pa. Cons. Stat. Ann. § 4209(a), (c). NBT's position also overlooks the fact that, pursuant to § 4103 of the UCC, *all* of Regulation CC is binding on the parties. Moreover, to the extent there is a conflict between Regulation CC's broadly worded "actual loss" remedy and the provisions of the UCC that create a strict accountability regime with respect to the midnight deadline rule, such a conflict must be resolved in favor of Regulation CC. Support for this result flows from subpart C of Regulation CC itself, which states that "the provisions of this subpart supersede any inconsistent provisions of the UCC as adopted in any state . . . ." *See* 12 C.F.R. § 229.41. This result is also supported by § 4103 of the UCC, which, as set forth above, indicates that Federal Reserve regulations are binding on all parties operating under the UCC and that such regulations are considered "agreements" that may vary the effect of the UCC's provisions. *See* 13 Pa. Cons. Stat. Ann. § 4103(a)-(b). In sum, where NBT's claim is dependent upon FNCB's noncompliance with the encoding requirements imposed by Regulation CC, NBT cannot render the Regulation CC damages clause inapplicable merely by characterizing its claim as an effort to hold FNCB accountable under the UCC.

30

NBT offers a second argument in support of its view that Regulation CC's ordinary care liability standard and "actual loss" remedy provision do not alter the UCC's regime of strict accountability for noncompliance with the midnight deadline rule in the circumstances presented here. NBT asserts that § 4301(d) of the UCC requires a payor bank to comply with clearinghouse rules or transferor instructions in order effectively to return an item prior to the midnight deadline. NBT points out that the rules or instructions governing the Reserve Bank's check-processing services are contained in Federal Reserve Operating Circular No. 3. NBT argues that Operating Circular No. 3's references to encoding requirements, when read in conjunction with § 4301 of the UCC, create an independent obligation on the part of FNCB to encode the Disputed Check with the correct routing number, and that FNCB's failure to do so means that the Disputed Check was not "returned" within the meaning of the midnight deadline rule.

While NBT correctly states that Operating Circular No. 3 binds the parties, NBT incorrectly asserts that the Circular's references to encoding requirements somehow negate Regulation CC's requirement that damages be measured with reference to actual loss. Operating Circular No. 3 does not contain an independent encoding requirement. Instead, it incorporates subpart C of Regulation CC *in its entirety*, including both the encoding requirement as well as ordinary care liability standard and the remedy provision stating that

31

the measure of damages for failure to comply with subpart C of Regulation CC is to measured by the claimant's actual loss. *See* Fed. Reserve Op. Circ. No. 3, at 1, ¶ 1.1. While Operating Circular No. 3 does state that its own provisions supersede any inconsistent provisions of the UCC and Regulation CC, nothing in Operating Circular No. 3 contradicts or is inconsistent with the Regulation CC provision calling for measurement of damages based upon actual loss. Nor does Operating Circular No. 3 impose an encoding requirement separate or apart from its incorporation of the encoding provisions of Regulation CC. The Circular's references to encoding simply emphasize that Reserve Banks retain the right to rely on the routing number encoded on a qualified return check, while stating that a payor bank that erroneously encodes a routing number agrees to indemnify the Reserve Bank for any loss suffered as a result of the error. *See id.* at 10, ¶ 15.6.

These encoding references in Operating Circular No. 3 do not impose a separate encoding obligation apart from the encoding requirement imposed by Regulation CC, and they in no way alter or conflict with Operating Circular No. 3's incorporation of the Regulation CC provision requiring that damages resulting from noncompliance be measured with reference to the claimant's actual loss. Thus, to the extent Regulation CC's encoding requirement is deemed a "clearinghouse rule" or "transferor instruction" by virtue of its incorporation into Operating Circular No. 3, it is a rule or

32

instruction with a specific remedy attached. Moreover, to the extent that this remedy (damages based upon actual loss) conflicts with the strict accountability remedy available under the UCC's check-return provisions, the conflict must be resolved in favor of the former. As discussed above, this result is dictated by Operating Circular No. 3, which states that the Circular's provisions supersede any inconsistent provisions of the UCC. *See id.* at 1, ¶ 1.1. This result is also supported by the UCC itself, which provides that clearinghouse rules are binding on the parties involved in a checking transaction, and that such a binding agreement may vary the UCC so long as it does not purport to disclaim a bank's obligation to act in good faith and exercise ordinary care. *See* 13 Pa. Cons. Stat. Ann. § 4103(a)-(b).

## IV. CONCLUSION

NBT has consistently emphasized that it seeks recovery pursuant to §§ 4215, 4301, and 4302 of the UCC. The UCC itself directs that its provisions, including those that create a strict accountability regime in connection with the midnight deadline rule, may be altered by agreement. The UCC also provides that Federal Reserve regulations and operating circulars are by operation of law deemed binding agreements governing all parties subject to Article 4 of the UCC. The encoding requirements invoked by NBT are found in subpart C of Regulation CC. Subpart C indicates that compliance with its provisions is to be measured by a

33

standard of ordinary care.  Subpart C also states that the measure of damages for a failure to exercise ordinary care in complying with its requirements is the actual loss a claimant suffers as a result of such failure.

In the present case, the parties stipulated that NBT did not suffer any actual damages as a result of FNCB's encoding error.  The parties are bound by Regulation CC in its entirety, including its remedy provision, which supersedes any inconsistent provisions of the UCC.  NBT thus may not invoke §§ 4215, 4301, and 4302 of the UCC to require that FNCB be held strictly accountable for the Disputed Check based upon FNCB's failure to comply with Regulation CC's encoding requirement.

The fact that the parties are also bound by Federal Reserve Operating Circular No. 3 does not change the result.  To the extent Operating Circular No. 3 incorporates the encoding requirement of Regulation CC, it also incorporates Regulation CC's liability standard and remedy provision.  As with Regulation CC, the provisions of Operating Circular No. 3 by operation of law form an agreement that binds the parties and that varies any inconsistent UCC provisions.  NBT's attempt to invoke UCC provisions that create strict accountability in connection with the midnight deadline rule fails to acknowledge that, in this case, these provisions have been effectively amended by Operating Circular No. 3's incorporation of Regulation CC's "actual loss" remedy

34

provision.

Accordingly, because the facts are not in dispute, and because NBT's claim fails as a matter of law, we affirm the order of the District Court granting summary judgment in favor of FNCB