In re FEDERAL–MOGUL GLOBAL, INC., T & N Limited, et al., Debtors.

Cellco Partnership D/B/A Verizon Wireless, Plaintiff,

v.

Federal–Mogul Global, Inc., Bank of America, N.A., Bank of America Corporation and Mellon Bank, Defendants.

Bankruptcy No. 01–10578(RTL).
Adversary No. 04–52934(RTL).

United States Bankruptcy Court, D. Delaware.

Jan. 14, 2005.

Charles J. Brown, III, Elzufon, Austin, Reardon, Samuel B. Santo, Jr., Tarlov &

Mondell, Lowenstein Sandler PC, Roseland, NJ, for Plaintiff.

William F. Taylor, Jr., McCarter & English, LLP, Wilmington, DE, Katharine L. Mayer, Dover, DE, Joseph F. McDonough, Nathanial H. Schmitt, Manion, McDonough & Lucas, P.C., Pittsburgh, PA, for Defendant, Mellon Bank, N.A.

Laura Davis Jones, James O'Neill, Michael Seidl, Pachulski, Stang, Ziehl, Young, Jones & Weintraub, P.C., for Defendant, Federal–Mogul Global, Inc.

Duane D. Werb, Jennifer H. Unhoch, Werb & Sullivan, Dennis P. McGlone, Hope D. Miller, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, LLC, for Defendant, Bank of America, N.A.

## OPINION

RAYMOND T. LYONS, Bankruptcy Judge.[1]

Mellon Bank, N.A. ("Mellon") moved for summary judgment that it has no liability for paying a check drawn by plaintiff, Cellco Partnership d/b/a Verizon Wireless ("Verizon"). Although the payee did not indorse the check, Section 4–205 of the Uniform Commercial Code[2] makes the depository bank a holder where the payee delivers the check to the depository bank for collection. Mellon paid Bank of America, N.A. ("BofA"), the depository bank and holder of the check. The item was

properly payable and Mellon had the right to charge Verizon's account.

## JURISDICTION

The .bankruptcy court has jurisdiction over this adversary proceeding that arises in and is related to a case under Title 11.[3] 28 U.S.C. § 1334(b), 28 U.S.C. § 157(a) and the Order of Reference from the United States District Court for the District of Delaware dated December 10, 2001, referring this case under Title 11 and all proceedings arising under Title 11 of the United States Code to the bankruptcy judges in this district. This motion is a core proceeding that may be heard and determined by a bankruptcy judge pursuant to 28 U.S.C. § 157(b)(2)(B) and (O).

## FACTS AND PROCEDURAL HISTORY

The following facts are not disputed. On September 5, 2000, Verizon drew its check # 2439027 on its account at Mellon to the order of Kyocera Wireless in the amount of $1,120,319.90 in payment of goods and services. Pursuant to Kyocera's instructions, Verizon mailed the check to a lock-box center maintained by BofA in Chicago. In accordance with the authorization given by Kyocera, BofA took possession of the check for collection and sent it to the Federal Reserve Bank[4] for presentation to the drawee bank, Mellon. On September 8, 2000 Mellon paid the check. By mistake, BofA did not credit

1. Raymond T. Lyons, U.S. Bankruptcy Judge, District of New Jersey; by assignment to the U.S. Bankruptcy Court, District of Delaware.

2. Since the payor bank, Mellon, is located in Philadelphia, its liability is governed by Pennsylvania law. 13 Pa. Cons.Stat. Ann. § 4102(b) (2204). The Uniform Commercial Code (U.C.C.) and the relevant amendments have been adopted in identical form in each of the states that might be involved. Therefore, the court will refer only to the U.C.C.

3. This adversary proceeding began with plaintiff's request to enjoin transfer of cash by the debtor and to determine plaintiff's rights in assets held by the debtor. BofA has filed a proof of claim in this bankruptcy case for the same amount sought by plaintiff.

4. See Regulation J, 12 C.F.R. §§ 210.1–210.32 (2005); Regulation CC, 12 C.F.R. §§ 229.30–229.43 (2005); see also, NBT Bank v. First National Community Bank, 393 F.3d 404, 410, 2004 WL 3015569, at *5 (3d Cir. 2004).

Kyocera's account but, instead, credited the account of Federal–Mogul, another of its lock-box customers.[5]

Before October 6, 2000, Kyocera, being unaware of the erroneous credit, contacted Verizon to inquire about payment of its invoices. Verizon's personnel discussed stopping payment[6] on check # 2439027 but, apparently, took no action. On October 24, 2000 Kyocera renewed its request for payment. Verizon drew another check on Mellon, # 2571931, dated October 26, 2000, payable to Kyocera in the amount of $1,400,584.25 to replace check # 2439027 plus pay additional invoices for Kyocera's services. Just as before, Verizon mailed the new check to the lock-box in Chicago. BofA took possession of the check for collection and Mellon paid; only this time BofA properly credited Kyocera's account. The net effect of these two checks was Federal–Mogul had $1,120,319.90 of Verizon's money to which Federal–Mogul was not entitled.

Verizon took no efforts to get its money back for two and a half years. Meanwhile, Federal–Mogul closed its account at BofA on June 29, 2001.[7] On October 1, 2001 Federal–Mogul filed a voluntary petition under chapter 11 of the Bankruptcy Code in this court.

An audit of Verizon's books in early 2003 disclosed the payment of check # 2439027. Verizon's initial conclusion was that Kyocera had been paid twice, so on February 7, 2003 Verizon requested a refund from Kyocera. Kyocera's books showed only one payment—the replacement check # 2571931. On February 15, 2003, Kyocera contacted BofA and inquired regarding check # 2439027. BofA researched the matter and admitted that the credit had been posted to Federal–Mogul's account in error, not to Kyocera's. This information was relayed to Verizon who initiated a claims process against BofA through Mellon. On August 8, 2003, BofA wrote to Mellon denying the claim for reasons not relevant to this motion. Mellon, in turn, forwarded the denial on to its customer, Verizon, on September 5, 2003, three years to the day after the check had been written.

Thereafter, Verizon tried to pursue Federal–Mogul for the money, but learned of this bankruptcy case. On March 4, 2004,[8] Verizon filed a complaint against Federal–Mogul to determine that $1,120,319.90 in cash was not property of the debtor's estate and for an injunction requiring the debtor to relinquish the money to Verizon. Mellon and BofA were joined as co-defen-

5. Federal–Mogul realized that the credit to its account was an error by BofA and made a special entry on its books as "Verizon Wireless deposit in error." Whether Federal–Mogul and BofA communicated at that time regarding the mistaken credit is not relevant to Mellon's motion for summary judgment but may impact on the rights of the remaining parties.

6. A stop payment request would have been too late since Mellon had already paid the check. U.C.C. § 4–403(a) (1990).

7. The balance in the account was only $24,701.71 when it was closed but Federal–Mogul continued to carry the entry on its

books for $1,120,319.90 described as "Verizon Wireless deposit in error."

8. The complaint was filed well beyond the three-year statute of limitations of U.C.C. § 4–111. Mellon's motion for summary judgment asserted the statute of limitations as an additional grounds for its nonliability. Of course, Mellon is correct, subject only to Verizon's claim that Mellon is estopped to raise the statute of limitations, for which Verizon had developed little factual support to date. In light of the granting of summary judgment to Mellon on substantive grounds it is unnecessary to consider Verizon's request for additional discovery regarding estoppel as to Mellon.

dants under various theories of contract and tort liability. Mellon cross-claimed against BofA and the debtor, Federal–Mogul. BofA had previously filed a proof of claim for $1,120,319.90 relating to the erroneous credit to Federal–Mogul's bank account at BofA in Federal–Mogul's bankruptcy case on February 27, 2003, just prior to the March 3, 2003 bar date.

### DISCUSSION

■ Verizon has withdrawn all counts of its complaint against Mellon, except for the contract claim under § 4–401 of the U.C.C. Verizon argues that Mellon has no right under § 4–401 to charge its account for the check payable to Kyocera that BofA had credited to the account of Federal–Mogul. Mellon relies on § 4–205 that imposes a warranty on the depositary bank, BofA, that funds have been credited to the proper account. The sole liability for breach of that warranty, says Mellon, lies with BofA. Mellon argues that § 4–401 does not apply because § 4–205 provides the sole remedy. For the reasons stated below, the court holds that § 4–401 is applicable, but that Mellon was entitled to charge Verizon's account because the check was properly payable.

■ Section 4–401 of the U.C.C. imposes liability on a drawee bank only by negative implication. Indeed the statute is titled "When bank may charge account of customer." The section does not explicitly fix liability of a bank to its customer but one must infer that, unless the statute authorizes a bank to charge its customer's account, it may not; and, if a bank charges a customer's account for an item that is not authorized, the bank must reverse the entry. JAMES J. WHITE & ROBERT S. SUMMERS, Uniform Commercial Code § 21–3 (4th ed.1995) (hereinafter *"White & Summers"*).

Section 4–401 reads as follows:

Where bank may charge account of customer

(a) A bank may charge against the account of a customer an item that is properly payable from that account . . . . An item is properly payable if it is authorized by the customer and is in accordance with any agreement between the customer and the bank.

U.C.C. § 4–401.

The official comments to this section of the U.C.C. explain "[a]n item containing a forged drawer's signature or forged indorsement is not properly payable." *Id,* Comment 1; *see also, White & Summers § 21–3(a).*

The usual remedy for a drawer injured by the drawee's mistaken payment over a forged indorsement is essentially a breach of contract action for reaccrediting of the drawer's account. The Code permits a drawee bank to debit the depositor's account after it has paid an item according to the depositor's order, i.e., an item which is "properly payable." An item is properly payable if the depositor has authorized payment to the individual presenting the item for payment. Expressly permitting the drawee bank to debit their depositor's account for any items which are properly payable implies that such banks cannot debit their depositor's accounts for items not properly payable. A negotiable instrument bearing a forged indorsement is not a properly payable item. Therefore, a drawer whose check was paid over a forged indorsement may sue a drawee bank for wrongful payment.

Richard J. Scislowski, Comment, *The U.C.C. Section 4–205(2) Payment/Deposit Warranty: Allow a Drawer to Hold a Depositary Bank Liable For Collecting an Item With a Forged Indorsement,* 28 Ak-

ron L.Rev. 573, 577–578 (1995) (hereinafter "*Scislowski*").

Conversely, one could conclude that a check signed by the drawer and indorsed by the payee is properly payable, thus entitling the payor bank to charge the item to the drawer's account. The issue is this case is whether the check presented by BofA as holder was properly payable by Mellon even though unindorsed by the payee.[9] U.C.C. § 4–401, Official Comment 1 addresses an unindorsed check:

> Concern has arisen whether a bank may require a customer to execute a stop-payment order when the customer notifies the bank of the loss of an unindorsed or specially indorsed check. Since such a check cannot properly be payable from the customer's account, it is inappropriate for a bank to require stop-payment order in such case.

U.C.C. § 4–401, Comment 1. To understand why a lost, unindorsed check is not properly payable, one must resort to Article 3 of the U.C.C. dealing with negotiable instruments. Ordinarily, a check is a negotiable instrument drawn on a bank. *Id.* at § 3–104(f). The purpose of negotiable instrument law is to facilitate payment and encourage acceptance of negotiable instruments as the functional equivalent of cash. *Amberboy v. Societe de Banque Privee*, 831 S.W.2d 793, 796 (Tex.1992). Detailed requirements are set forth to describe negotiable instruments, their transfer, and the rights and responsibilities of the various parties. Article 4 adds special rules dealing with bank deposits and collections. *NBT Bank*, 393 F.3d at 409, 2004 WL 3015569 at *3. Key provisions of Article 3

pertinent to this adversary proceeding are negotiation and the rights of a holder.

Negotiation is defined as the transfer of possession of an instrument to a person who becomes a holder. U.C.C. § 3–201(a). "[I]f an instrument is payable to an identified person, negotiation requires transfer of possession of the instrument and its indorsement by the holder." *Id.* at § 3–201(b). *Knight Pub. Co. v. Chase Manhattan Bank*, 125 N.C.App. 1, 479 S.E.2d 478 (1997). *See* generally, *McMullen Oil Co. v. Crysen Refining, Inc. (In re McMullen Oil Co.)*, 251 B.R. 558, 566–567 (Bankr. C.D.Ca.2000). A holder is entitled to enforce the instrument. U.C.C. § 3–301(1). Either the drawee of an accepted draft (U.C.C. § 3–413(a)) or the drawer of an unaccepted, dishonored draft (U.C.C. § 3–414(b)) is obligated to pay the draft to a holder as a person entitled to enforce the draft. "The issuer of a negotiable instrument ... may discharge its obligation to pay the instrument only by paying a person entitled to enforce under Section 3–301." U.C.C. § 3–102, Comment 2. *See also* U.C.C. § 3–602(a).

The 1990 amendments to Article 4 of the U.C.C. created another method of negotiation.[10] Section 4–205(1) makes a depositary bank a holder of an item[11] if a customer delivers the item to the bank for collection. Previously, this section authorized the depositary bank to supply its customer's indorsement to fulfill the requirement for negotiation under § 3–201(b). The amendment eliminates the requirement of indorsement, permitting the depositary bank to become a holder without the indorsement of its customer.[12] The official comments confirm this result:

---

9. The payee, Kyocera, did not indorse check # 2439027. BofA's stamp with its name may be its indorsement but that is irrelevant to Mellon's summary judgment motion.

10. In the event of a conflict between Article 3 and 4, Article 4 governs. U.C.C. § 4–102(1).

11. A check handled for collection is an item. U.C.C. § 4–104.

12. *Contra*, U.C.C. § 3–203(c) ("negotiation of an instrument does not occur until the in-

Paragraph (1) provides that the depositary bank becomes a holder when it takes the item for deposit if the depositor is a holder. Whether it supplies the customer's indorsement is immaterial. U.C.C. § 4–205, Comment.

The reason for this new rule is explained by the official comment, as well:

> It is common practice for depositary banks to receive unindorsed checks under so-called "lock-box" agreements from customers who receive a high volume of checks. No function would be served by requiring a depositary bank to run these items through a machine that would supply the customer's indorsement except to afford the drawer and the subsequent banks evidence that the proceeds of the item reached the customer's account.[13]

*Id. See also,* HENRY J. BAILEY AND RICHARD B. HAGEDORN, *Brady on Bank Checks: The Law of Bank Checks,* ¶ 12.03 (Rev. Ed.2004) and BARKLEY CLARK AND BARBARA CLARK, *The Law of Bank Deposits, Collections and Credit Cards,* ¶ 5.03[2] (Rev. Ed.2004).

Applying these concepts from both Articles 3 and 4 of the U.C.C. to the facts of this case yields the following. Kyocera, the payee of the check, had a lock-box agreement with BofA. When BofA accepted delivery for collection of Verizon's check payable to Kyocera, BofA became a holder of check # 2439027. U.C.C. § 4–205(1). As a holder, BofA was entitled to enforce the check. U.C.C. § 3–301(1). The check presented to Mellon by BofA as a holder entitled to enforce the check was properly payable and Mellon is entitled to charge Verizon's account under U.C.C. § 4–401(a).

Verizon argues that the check was not properly payable because BofA breached its warranty that "the amount of the item was paid to the customer or deposited in the customer's account" under U.C.C. § 4–205. According to Verizon, BofA's failure to properly credit Kyocera's account for the amount of Verizon's check means that Mellon is not authorized by Verizon to pay BofA and charge Verizon's account. Since Verizon issued its check to Kyocera, and Kyocera did not receive the money, the check was not properly payable and Mellon cannot charge it to Verizon's account, argues Verizon.

Lock-box agreements are established for the convenience of the payee, such as Kyocera, that receives a large volume of checks.[14] The amendment to U.C.C. § 4–

dorsement is made"); *see McMullen Oil Co.,* 251 B.R. at 568.

13. The parties have not cited, nor has the court's own research revealed, a decision applying revised U.C.C. § 4–205 to similar facts. The most similar factual scenario the court found is *Continental Airlines, Inc. v. Boatmen's National Bank of St. Louis,* 13 F.3d 1254 (8th Cir.1994). There the payee of a check (Continental) sued the bank (Boatmen's) with whom it had a lock-box agreement. Boatmen's received a check payable to Continental but sent the money to another one of its customers because the drawer of the check typed on the wrong lock-box number. The recipient of the funds ended up in bankruptcy. The depository bank that maintained the lock-box (Boatmen's) was found liable to its customer, the payee (Continental). The drawee bank was not a party to the suit. The case was decided applying the U.C.C. before the 1990 Amendments. In this case, the payee (Kyocera) is not a party to this adversary proceeding.

14. "One such procedure, which evolved to accommodate certain commercial depositors who accumulate large numbers of checks during the course of their businesses, involves the use of 'lock boxes.' Generally speaking, there are two situations in which lock boxes are employed. First, institutions receiving a large daily volume of checks on a daily basis may direct payment to a post-office box, for

205 eliminates the requirement that the payee indorse the check, again for the convenience of the payee.

> An important goal of the 1990 revision of Article 4 is to promote the efficiency of the check collection process by making the provisions of Article 4 more compatible with the needs of an automated system and, by doing so, increase the speed and lower the cost of check collection for those who write and receive checks.

U.C.C. § 4–401, Comment 2.

> The purpose of an enactment may become clear upon examining the evils or mischief the legislation was designed to prevent. Apparently, depositary banks sometimes mistakenly credit the wrong account when gathering checks from customer's lock boxes. Obviously the drawer has a vested interest in seeing that the proceeds are accredited to the intended payee's account. The drafters have indicated in the Official Commentary that they included the Payment/Deposit Warranty in section 4–205(2) to fill the need for some kind of receipt flowing from the depositary bank to the drawer to indicate that the depositary

> which the depositary bank is responsible. Apparently, these depositing institutions routinely failed to indorse the checks. Under prior Article 4, depositary banks could become holders of the unindorsed items for collection purposes if the bank placed some sort of statement on the item 'to the effect that the item was deposited by a customer or credited to his account.' Since the banks could provide missing indorsements, one can *imagine that businesses accumulating large* amounts of checks would be tempted to deposit them without indorsements. The second situation where lock boxes are used is where a bank has made loans to a business or other institution and wishes to exercise greater control over the collection of payments. Pursuant to an agreement, the borrower would instruct its customers to send their checks to the lock box for the collecting bank to process. Because the borrower is the named payee on all these checks but never

bank correctly disposed of the collected proceeds. No such receipt existed under the prior version of the code.

*Scislowski,* 28 Akron L.Rev. at 591–592. If an error is made by the depositary bank in crediting the wrong account, nevertheless, the check has been negotiated and the depositary bank has become a holder. U.C.C. § 4–205. The check is properly payable to the holder and may be charged to the drawer's account. *Id.,* § 4–401.

Verizon posits that a drawee bank is strictly liable to its customers and should bear the loss if funds go astray. The following excerpt from *Coffin v. Fidelity–Philadelphia Trust Co.,* 374 Pa. 378, 391, 97 A.2d 857, 863 (1953) was quoted by Verizon:

> The basic principle of law relied on by the plaintiffs is not disputed by the defendant bank to the effect that a bank by accepting a deposit guarantees that it will not pay the depositor's money except (1) to the depositor or (2) the payee named by the depositor in checks drawn on the bank or (3) to the person who by

> came into possession of the checks, it obviously could not indorse them. In either situation the depositary bank found themselves encumbered with the time consuming responsibility of supplying the missing indorsements.

> The drafters of the revision recognized that such a chore is largely meaningless. Accordingly, revised U.C.C. section 4–205(1) accommodates this practice. It eliminates the need for the depositary bank to print anything on unindorsed items because they become holders upon receipt. Additionally, the drafters created a new warranty in paragraph two that runs from the depositary bank taking items for collection to a number of parties, including the drawers of the checks. Essentially this warranty imposes an obligation on the depositary bank to either pay or deposit the proceeds of the item to the benefit of the bank's 'customer'." *Scislowski,* 28 Akron L.Rev. at 574–575.

reason of a valid endorsement from the payee becomes entitled to such payment.

Verizon argues that the scheme of the U.C.C. requires that, "if an initial error committed by the depositary bank (here, Bank of America) results in loss, it is intended that the payee/drawee bank (here, Mellon Bank) pass liability up through the 'chain of collection', and that the depositary bank ultimately suffer the loss." Verizon's Letter Brief dated December 14, 2004. In support of this theory Verizon cites *McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750 (3d Cir.1990) and *Travelers Indemnity Co. v. Stedman*, 895 F.Supp. 742 (E.D.Pa.1995). Verizon also relies upon *Perini Corp. v. First National Bank of Habersham County*, 553 F.2d 398 (5th Cir.1977) and *Coffin v. Fidelity–Philadelphia Trust Co.*, 374 Pa. 378, 97 A.2d 857 (1953). The distinction is that each of these cases involved forged signatures: *McAdam* (forged indorsement); *Travelers* (forged drawer's signature and forged indorsement); *Perini* (forged drawer's signatures and forged indorsement) and *Coffin* (forged indorsement).

As the court in *Perini* wrote:

Perpetuating a distinction introduced into the legal annals by Lord Mansfield in the eighteenth century, the Code accords separate treatment to forged drawer signatures (hereinafter "forged checks") and forged indorsements. In general, the drawee bank is strictly liable to its customer drawer for payment of either a forged check or a check containing a forged indorsement. In the case of a forged indorsement, the drawee generally may pass liability back through the collection chain to the party who took from the forger and of course, to the forger himself if available. In the case of a forged check, however, liability generally rests with the drawee.

*Perini*, 553 F.2d at 403.

This scheme to pass liability back through banking channels deals with forged signatures and stolen instruments.[15] But the check in this case does not involve a forged signature or a stolen instrument. The requirement for an indorsement has been eliminated. Check # 2439027 was properly transferred to BofA which became a holder entitled to enforce the check. BofA was in the same position as if Kyocera had indorsed the check and gave it to BofA for deposit. The check was properly payable within the meaning of U.C.C. § 4–401 and Verizon has no right to have its account at Mellon recredited.

## CONCLUSION

Check # 2439027 was delivered by the payee, Kyocera, to its depositary bank, BofA, for collection. Under U.C.C. § 4–205 BofA became the holder of the check and entitled to enforce it. U.C.C. § 3–301(1). The check was properly payable when presented by BofA and the drawee/payor bank, Mellon, was entitled to charge the account of the drawee, Verizon.

15. "These considerations, however valid, are counterbalanced by a very persuasive reason to allow a direct drawer's suit against a depositary bank. Under the current system, whenever a drawer incurs a loss due to the payment of an item over a forged indorsement, he or she must first look to the drawee bank. In turn, the drawee bank usually turns to the presenting bank with which it received the item in order to pass the loss on a breach of presentment warranty theory. The presenting bank in turn looks to the statutory transfer warranties to pass the loss to prior collecting banks. So, too, do these collecting banks resort to the transfer warranties to pass the loss down the collection chain until it lands upon the depositary bank. This system has been roundly criticized as circuitous and needlessly time-consuming." *Scislowski, 28 Akron L.Rev.* at 608.

Mellon's motion for summary judgment is granted.